**EDINBURG HOSPITAL AUTHORITY d/b/a Edinburg General Hospital, Petitioner,**

**v.**

**Shirley TREVIÑO and Oscar Treviño, Respondents.**

**No. 95–0939.**

Supreme Court of Texas.

Argued April 18, 1996.

Decided Feb. 6, 1997.

Rehearing Overruled April 18, 1997.

---

Kenda B. Dalrymple, Marian Jeu, C. Dean Davis, Austin, for petitioner.

Preston Henrichson, David P. Kallus, Edinburg, John David Franz, McAllen, Richard D. Schell, E.R. Fleuriet, Harlingen, for respondents.

SPECTOR, Justice, delivered the opinion for the Court, in which PHILLIPS, Chief Justice, and HECHT, CORNYN, ENOCH, OWEN and BAKER, Justices, joined, in Parts I and IV of which GONZALEZ, Justice, joined, and in Parts I, III, and IV of which ABBOTT, Justice, joined.

In this medical malpractice case we consider whether a mother and father may recover mental anguish damages resulting from the delivery of a stillborn fetus. The jury found that Edinburg Hospital Authority, d/b/a Edinburg General Hospital, and its employees had negligently caused the mother and father mental anguish resulting from the loss of the fetus, and the trial court awarded damages to both. The court of appeals affirmed. 904 S.W.2d 831. We hold that the mother has

stated a negligence cause of action but failed to present adequate proof of mental anguish damages under this Court's decision in *Krishnan v. Sepulveda*, 916 S.W.2d 478 (Tex. 1995). We hold also that neither the mother nor the father is entitled to mental anguish damages as a bystander to the loss of the fetus. Accordingly, we reverse the judgment of the court of appeals, remanding in part and rendering in part.

## I.

Shirley Mora (formerly Treviño) and Oscar Treviño were expecting their first child in the spring of 1989. Mora's water broke, indicating the start of labor, on May 27, 1989. For unexplained reasons, Mora waited a day before admitting herself to Edinburg General Hospital. Dr. Carl Gruener was the attending physician for the delivery.

After Mora had been in the hospital several hours, Dr. Gruener determined that labor was progressing too slowly and ordered the administration of Pitocin, a drug used to augment labor. Mora soon began to hemorrhage, and Dr. Gruener performed an emergency caesarean section. The fetus was stillborn. Treviño was with his wife in the hospital up until the time she was taken into surgery, but he did not witness the actual delivery.

Mora sued Dr. Gruener and the hospital, alleging that their negligent treatment caused the stillbirth. Mora contended that the doctor and the hospital negligently monitored the administration of the Pitocin and the fetal heartbeat equipment. Treviño intervened, claiming that he suffered mental anguish as a bystander witnessing the events leading up to the stillbirth. Dr. Gruener eventually settled with both Mora and Treviño before the trial.

The jury found that the hospital employees' negligence in the use of the hospital's tangible personal property caused Mora's and Treviño's mental anguish as a result of the stillbirth. The jury awarded Mora and Treviño $750,000 each in damages. The trial court reduced the damages to $250,000 each under the Texas Tort Claims Act. *See* TEX. CIV.PRAC. & REM.CODE § 101.023(c).

## II.

■ Initially, we must determine if Mora asserted a valid cause of action against the hospital and its employees. Because the hospital is a governmental unit, sovereign immunity prevents liability unless Mora can show property damage, personal injury, or death "caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX.CIV.PRAC. & REM.CODE § 101.021(2).

In her first amended petition, Mora pleaded two causes of action in support of her mental anguish damages. First, she alleged that the hospital's treatment of her resulted in the loss of her fetus and constituted negligent infliction of mental anguish. Second, Mora alleged that she "was a bystander at the death of her infant," and that witnessing this event caused her great mental anguish. She alleged no other claims against the hospital or its employees in the trial court.

No cause of action for wrongful death existed at common law; the right to sue for wrongful death is "purely a creature of statute." *Witty v. American Gen. Capital Distribs., Inc.*, 727 S.W.2d 503, 504 (Tex.1987). In *Witty*, we explained that the Texas Wrongful Death Act precludes recovery for the loss of a fetus when there has been no live birth. *Id.* This holding was based on the language of the Act viewed in light of the longstanding common law rule that the rights of a fetus were contingent on live birth. *Id.* at 505. Similarly, there is no survival cause of action for the loss of a fetus or for negligent medical treatment of a fetus not born alive. *Id.* at 506; *see Pietila v. Crites*, 851 S.W.2d 185, 186 (Tex.1993); *Yandell v. Delgado*, 471 S.W.2d 569, 570 (Tex.1971). Without these causes of action, parents "are precluded from recovering damages for their loss of society, companionship, and affection suffered as a result of the loss of the fetus." *Krishnan*, 916 S.W.2d at 482.

In *Krishnan*, this Court addressed "whether a mother may recover mental anguish damages suffered because of the loss of her fetus resulting from an injury to the *mother* which was caused by the physician's allegedly negligent treatment of the mother." *Id.* at

840 (emphasis added). We held that, because mental anguish damages are available in personal injury actions generally, they are recoverable when suffered as a result of a negligently inflicted injury to the woman "which includes the loss of her fetus." *Id.* at 481–82. Because Mora pleaded that she suffered a personal injury including the loss of her fetus resulting from a breach of a legal duty owed to her, she has stated a valid cause of action.

■ Although Mora has a negligence claim against the hospital for the personal injury she sustained in losing the fetus, she does not have a viable cause of action as a bystander for the loss of her fetus. We adopted the bystander cause of action in Texas based on guidelines set forth in a California case. *See Dillon v. Legg*, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968), *construed in Freeman v. City of Pasadena*, 744 S.W.2d 923, 923 (Tex.1988). As we stated in *Boyles v. Kerr*, "[b]efore a bystander may recover, he or she must establish that the defendant has negligently inflicted serious or fatal injuries on the primary victim." 855 S.W.2d 593, 598 (Tex.1993). The hospital could not be held liable for a negligent injury to Mora's fetus because, under established law, it does not owe a duty to a fetus that is not born alive. *See Krishnan*, 916 S.W.2d at 479; *Yandell*, 471 S.W.2d at 570. Additionally, Mora cannot be a bystander to her own personal injury. The hospital thus cannot be held liable to Mora under a bystander cause of action. Mora's only viable cause of action must be for the hospital's negligent treatment that resulted in personal injury to her.

■ At trial, Mora sought to prove mental anguish damages in part by presenting evidence that she had made preparations in expectation of the arrival of her baby: she had set aside a room in her home for the baby and purchased furniture for the room. She also testified that the loss of the fetus "still hurts [her] like it was yesterday," that she carries a clipping of the funeral service with her, and that her marriage deteriorated after the loss of the fetus. This evidence relates to the grief that Mora felt over the loss of the fetus as a separate individual and not as part of her own body. *Krishnan* and our decision today clarify that a woman can recover mental anguish damages resulting from negligent treatment that causes the loss of a fetus *as part of* the woman's body. Mora did not have the guidance provided by *Boyles* and *Krishnan* in this area of law, since both opinions were released after the trial in this case had occurred. This Court has broad discretion to remand for a new trial in the interest of justice when a party may have proceeded under the wrong legal theory. *See Boyles*, 855 S.W.2d at 603; *American Title Ins. Co. v. Byrd*, 384 S.W.2d 683 (Tex.1964). We therefore reverse the judgment of the court of appeals as to Mora and remand this part of the cause to the trial court for a new trial under the cause of action we recognized in *Krishnan*.[1]

### III.

■ We next determine whether Treviño may recover mental anguish damages against the hospital. In his petition in intervention, Treviño alleges that he suffered severe mental anguish after witnessing the negligent treatment of his wife, Shirley Mora. Under *Krishnan*, the hospital owes no legal duty to Treviño to provide competent medical care to Mora or the fetus. 916 S.W.2d at 482; *see also Cathey v. Booth*, 900 S.W.2d 339, 342 (Tex.1995). Treviño instead argues that he should be permitted to recover mental anguish damages against the hospital as a bystander to Mora's treatment.[2]

---

1. In his dissent, Justice Gonzalez admonishes the Court for failing to allow a wrongful death cause of action for the loss of a fetus. 941 S.W.2d at 86–88. His voluminous footnote purporting to cite caselaw supporting his position, however, is almost wholly inapposite. At least 33 of the 38 cases he cites allow recovery for this type of loss solely under a state wrongful death statute. The Texas Wrongful Death Act does not allow recovery for the loss of a fetus. *Witty*, 727 S.W.2d at 506. If the law is to change, it would be up to the Legislature, not this Court, to rewrite that statute to allow the cause of action that Justice Gonzalez seeks to create.

2. Treviño also alleges that the hospital owed him a duty of care arising from both his contractual relationship with the hospital as the guarantor of Mora's payment and the contract between Mora and the hospital, of which he was the third-party beneficiary. Treviño claims that the hospital breached these contracts by committing negligence, and he is therefore entitled to damages. These allegations are distinct from Treviño's by-

Treviño's bystander cause of action alleges that he was injured because he witnessed the nurses negligently administering the Pitocin and failing to timely administer anesthesia to Mora. He also witnessed the "failure of the nursing personnel to recognize signs of placental abruption as indicated on the contraction monitor." Treviño also saw Mora bleed heavily after some contractions and testified that he noticed blood clots in her bedpan that he thought were the fetus. Additionally, Treviño alleges mental anguish as a result of waiting for his wife to undergo an emergency caesarean section that resulted in the stillbirth. Treviño was not present for the stillbirth, however, and learned of it from a doctor only after the surgery.

■ A bystander may recover mental anguish damages under Texas law after witnessing a close relative suffer a traumatic injury because of a defendant's negligent action. *See Freeman,* 744 S.W.2d at 923. This recovery is permitted because we recognize that there are certain situations in which a tortfeasor will owe a bystander a duty of care beyond that owed to the public in general. *See id.* at 924. A bystander who witnesses a negligently inflicted serious or fatal injury may recover for mental anguish if:

(1) The bystander was located near the scene of the accident as contrasted with one who was a distance away from it.

(2) The shock resulted from a direct emotional impact upon the bystander from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.

(3) The bystander and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Freeman,* 744 S.W.2d at 924 (citing *Dillon,* 69 Cal.Rptr. at 80, 441 P.2d at 920); *see also Boyles,* 855 S.W.2d at 597–98. These factors are to be interpreted flexibly, however, and the court should determine in each case "whether the accident and harm was *reason-*

*ably* foreseeable." *Freeman,* 744 S.W.2d at 924.

This Court has never considered whether a bystander to medical malpractice can recover mental anguish damages. To recover damages under the *Dillon* standard, a bystander must show a contemporaneous sensory perception of an accident. *See Freeman,* 744 S.W.2d at 924. In *Ochoa v. Superior Court,* 39 Cal.3d 159, 216 Cal.Rptr. 661, 703 P.2d 1 (1985), the California Supreme Court determined that a medical malpractice plaintiff did not need to witness a sudden and brief occurrence to recover emotional damages as a bystander. *Id.* 216 Cal.Rptr. at 666–67, 703 P.2d at 7. Instead, the court held that the bystander had stated a valid cause of action "when there is observation of the defendant's conduct and the [patient's] injury and contemporaneous awareness [on the part of the bystander that] the defendant's conduct or lack thereof is causing harm to the [patient]." *Id.* 216 Cal.Rptr. at 668, 703 P.2d at 8. This relaxed standard permitted the plaintiff in *Ochoa* to recover mental anguish damages after she had repeatedly requested that a doctor examine her sick son, only to have her requests ignored and her son's condition deteriorate. Because the plaintiff in *Ochoa* witnessed her son's condition deteriorate as a direct result of the defendant hospital's conduct, and because she connected her son's injury with the hospital's conduct, the court found she had stated a valid bystander cause of action. *Id.* New Jersey has followed California's lead and relaxed the standard for bystander recovery in the medical malpractice context. *See Gendek v. Poblete,* 139 N.J. 291, 654 A.2d 970 (1995) (allowing medical malpractice bystander recovery when malpractice was connected with an injury and bystander suffered severe emotional distress).

Other jurisdictions, however, have refused to recognize a bystander cause of action in medical malpractice as the likelihood of hospitals' substantially curtailing patient visitation to prevent bystander suits. *See, e.g., Maloney v. Conroy,* 208 Conn. 392, 545 A.2d 1059, 1064 (1988). Other courts have decided

---

stander cause of action and were not alleged in the pleadings or tried by consent in the trial court. Treviño therefore waived these argu-

ments, and we need not pass on their merits. *See* Tex.R.Civ.P. 45(b); *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 186–88 (Tex.1977).

to allow recovery for only those bystanders who are within the zone of danger and suffer emotional distress as a result of a reasonable fear of a physical injury to themselves. *See Asaro v. Cardinal Glennon Mem. Hosp.*, 799 S.W.2d 595, 599 (Mo.1990); *Vaillancourt v. Medical Ctr. Hosp. of Vermont, Inc.*, 139 Vt. 138, 425 A.2d 92, 95 (1980). Because medical malpractice cases rarely involve a situation in which the bystander would fear physical injury, the zone of danger standard effectively precludes bystander recovery in these cases. *See Asaro*, 799 S.W.2d at 600. There are still other jurisdictions that have limited bystander recovery in medical malpractice cases by holding that the hospital has no duty of care to nonpatients. *See O'Hara v. Holy Cross Hosp.*, 137 Ill.2d 332, 148 Ill.Dec. 712, 714, 561 N.E.2d 18, 20 (1990).

We believe that the better-reasoned approach is not to permit bystander recovery in medical malpractice cases. The very nature of medical treatment is often traumatic to the layperson. Even when a medical procedure proves to be beneficial to the patient, it may shock the senses of the ordinary bystander who witnesses it. A bystander may not be able to distinguish between medical treatment that helps the patient and conduct that is harmful. A physician's primary duty is to the patient, not to the patient's relatives. Guided by these policy concerns, we hold that Texas' bystander cause of action precludes bystander recovery in medical malpractice cases.

We do not doubt that Mora's labor and the subsequent stillbirth were difficult and traumatic for Treviño, but Treviño claimed that he was injured as a bystander who witnessed malpractice upon his wife. Because we do not recognize bystander recovery in medical malpractice cases, Treviño has failed to state a valid cause of action. We accordingly reverse the judgment of the court of appeals as to Treviño.

## IV.

■ We next consider whether a settlement must be offset before or after applying the Tort Claims Act's damages cap. Although resolution of this issue is not essential to our disposition of this case, we address it to provide the trial court with guidance in the retrial of Mora's case. *See Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 773 (Tex.1964); *Parker v. Bailey*, 15 S.W.2d 1033, 1035 (Tex. Comm'n App.1929, holding approved).

Before the trial of this case, Mora's doctor, Carl Gruener, settled with Mora for $44,000. Mora then obtained a jury verdict against the hospital authority for $750,000. The trial court offset the verdict by the settlement amount. Because this $706,000 amount was greater than the hospital authority's liability limit under the Tort Claims Act, the trial court then reduced Mora's recovery down to what it determined to be the authority's liability cap and held it liable for that maximum amount. Edinburg Hospital Authority argues that the trial court should have first reduced the verdict down to the liability limit and then offset the settlement amount, thus holding the authority liable for its liability cap minus the settlement amount. We disagree.

■ Before the Legislature enacted the Tort Claims Act, TEX.CIV.PRAC. & REM.CODE chapter 101, governmental liability was limited to proprietary functions. *See* Joe R. Greenhill & Thomas V. Murto III, *Governmental Immunity*, 49 TEX.L.REV. 462, 462 (1971). The Legislature enacted the Tort Claims Act to provide a limited waiver of sovereign immunity. *Id.* at 467; *see* TEX.CIV. PRAC. & REM.CODE § 101.025. The Act's waiver of immunity is limited in at least two ways: by the types of claims that can be brought against a governmental unit, TEX. CIV.PRAC. & REM.CODE § 101.021, and by a cap on damages. *Id.* at § 101.023. Section 101.023 does not circumscribe a plaintiff's total recovery for a given injury. Instead, it delineates the extent of the government's waiver of immunity from liability for that injury. *See University of Texas at El Paso v. Nava*, 701 S.W.2d 71, 72 (Tex.App.—El Paso 1985, no writ). When a plaintiff suffers an injury that falls within the Tort Claims Act, the Legislature has agreed to hold the government liable up to a specified dollar amount. That a plaintiff may have settled with some defendants does not affect the

degree of waiver of sovereign immunity that the Legislature has prescribed.

Thus, while the dollar amount of a settlement must be reduced from the verdict under the "one satisfaction" rule, *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 5–7 (Tex.1991), the settlement does not affect the maximum dollar amount to which the government has agreed to waive its immunity. A settlement with one tortfeasor should thus be offset *before* the verdict against the governmental unit is reduced to the statutory maximum. A contrary rule, taken to its logical end, would completely bar recovery against a tortfeasing municipal hospital authority when a plaintiff settles with another defendant for more than the hospital authority's damages cap. Such a result cannot be the intent of the Legislature. On remand, should Mora be awarded a verdict against the hospital authority greater than its statutorily-imposed liability limit, the settlement with Dr. Gruener must be deducted from the verdict before the trial court reduces the verdict to the statutory limit.

## V.

Mora alleged negligent treatment of her that resulted in the loss of her fetus, as well as her own injury as a bystander; only the former is a cognizable cause of action in Texas. Mora failed, however, to prove mental anguish damages in accordance with our opinions in *Krishnan* and today. Treviño claimed to be a bystander to the medical malpractice allegedly committed upon his wife, which is not a valid cause of action against the hospital. We accordingly reverse the judgment of the court of appeals. We render judgment that Treviño take nothing on his bystander claim, and remand only Mora's portion of the case for a new trial in the interest of justice.

HECHT, Justice, concurring, joined by PHILLIPS, Chief Justice, and GONZALEZ, ENOCH, OWEN, BAKER and ABBOTT, Justices.

PHILLIPS, Chief Justice, GONZALEZ, ENOCH, OWEN, BAKER and ABBOTT, Justices and I join in this opinion, making it the opinion of the Court on the issue ad-dressed. In addition, PHILLIPS, Chief Justice, ENOCH, OWEN and BAKER, Justices, and I join in, Justice SPECTOR'S opinion for the Court. GONZALEZ, Justice, joins only in Parts I and IV of Justice SPECTOR'S opinion and dissents from the Court's judgment. ABBOTT, Justice, joins only in Parts I, III, and IV of Justice SPECTOR'S opinion and concurs in the Court's judgment.

The court of appeals held that under the Tort Claims Act, a hospital authority created under the Hospital Authority Act is subject to the liability limits for municipalities rather than the lower limits for units of local government. 904 S.W.2d at 840–841. The court of appeals' holding conflicts with *Huckabay v. Irving Hospital Authority*, 879 S.W.2d 64 (Tex.App.—Dallas 1993, writ dism'd by agr.). We consider this issue, as the Court considers the question of the settlement offset in Part IV of its opinion, "[t]o provide additional guidance to the trial court upon remand." *Ante* at 81. We disagree with the court of appeals.

The Tort Claims Act provides for a limited waiver of governmental immunity. One limit is on the dollar amount of liability. The limit has changed over time. When the Act was first passed in 1969, it contained a single limit on the liability of all "units of government": "Liability hereunder shall be limited to $100,000 per person and $300,000 for any single occurrence for bodily injury or death." Act of May 14, 1969, 61st Leg., R.S., ch. 292, §§ 2, 3, 1969 Tex.Gen.Laws 874, 875. In 1973 the Act was amended to add a limit of "$10,000 for any single occurrence for injury to or destruction of property." Act of April 11, 1973, 63rd Leg., R.S., ch. 50, § 1, 1973 Tex.Gen.Laws 77.

In 1983 the Act was amended to distinguish between state and local governments, to provide a higher $250,000/$500,000 cap on state government liability for bodily injury and death, and to set the property damage cap for both state and local governments at $100,000. State government was defined as "an agency, board, commission, department, or office, other than a district or authority created under Article XVI, Section 59, of the Texas Constitution, that: (1) was created by the constitution or a statute of this state;

and (2) has statewide jurisdiction." Act of May 28, 1983, 68th Leg., R.S., ch. 530, § 1, 1983 Tex.Gen.Laws. 3084. In 1985 the Act was recodified as part of the Civil Practice and Remedies Code. Act of May 17, 1985, 69th Leg., R.S., ch. 959, 1985 Tex.Gen.Laws 3242. The definition of state government was moved verbatim to section 101.001(5) of the Code, where it remains unchanged. The provisions limiting liability became section 101.023, as follows:

(a) Liability of the state government under this chapter is limited to money damages in a maximum amount of $250,000 for each person and $500,000 for each single occurrence for bodily injury or death and $100,000 for each single occurrence for injury to or destruction of property.

(b) Liability of a unit of local government under this chapter is limited to money damages in a maximum amount of $100,000 for each person and $300,000 for each single occurrence for bodily injury or death and $100,000 for each single occurrence for injury to or destruction of property.

Act of May 17, 1985, 69th Leg., R.S., ch. 959, 1985 Tex.Gen.Laws 3242, 3303.

While the state and its subdivisions created for purely public purposes are immune from liability for all their actions, a municipality or other governmental unit created only partly for public purposes is immune from liability only for its governmental conduct, not for its proprietary conduct. *City of Galveston v. Posnainsky*, 62 Tex. 118, 125 (1884). Prior to 1987 the line between a municipality's governmental and proprietary conduct was judicially drawn. In 1987 the Constitution was amended to authorize the Legislature to exercise this power, TEX. CONST. art. 11, § 13, and the Legislature did so by adding section 101.0215 to the Tort Claims Act. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 3.02, 1987 Tex.Gen.Laws 37, 47–48. The Legislature defined almost all the functions of a municipality as governmental, thus shrouding them with immunity from liability. *Id.* In exchange for this added protection, the Legislature increased the liability limits on bodily injury and death liability for municipalities by amending section 101.023(b) to begin, "Except as provided in Subsection (c)," and adding subsection (c) as follows:

(c) Liability of a municipality under this chapter is limited to money damages in a maximum amount of $250,000 for each person and $500,000 for each single occurrence for bodily injury or death and $100,000 for each single occurrence for injury to or destruction of property.

Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 3.03, 1987 Tex.Gen.Laws 37, 48. In effect, the Legislature separated municipalities from other units of local government. This legislation was part of a "tort reform" package enacted as Senate Bill 5.

The court of appeals held that "municipality" in the context of section 101.023(c) includes hospital authorities created under the Hospital Authority Act, chapter 262 of the Health and Safety Code. (The Code also authorizes municipal hospitals in chapter 261, county hospitals in chapter 263, county hospital authorities in chapter 264, joint municipal and county hospitals in chapter 265, and hospital districts in subtitle D. We consider only hospital authorities under chapter 262.) Hospital authorities were first permitted by the Legislature in 1957. Act of May 17, 1957, 55th Leg., R.S., ch. 472, 1957 Tex.Gen. Laws 1379, formerly Tex.Rev.Civ.Stat. ann. art. 4437e (West 1976). A hospital authority is a "body politic and corporate" that "does not have taxing power", created by ordinance by one or more municipalities. Tex.Health & Safety Code § 262.003. It is governed by a board of directors, *id.* § 262.011, appointed—with certain exceptions—for two-year terms by the governing body of the municipality that created it (governing bodies, if more than one municipality), *id.* § 262.012. A hospital authority may sue and be sued, *id.* § 262.021(b)(2), may own, operate and maintain hospitals, *id.* § 262.022, may issue revenue bonds to fund its purposes, *id.* § 262.041, and may exercise the power of eminent domain under the Property Code as if it were a municipal corporation, *id.* § 262.028.

Nothing in the history or purpose of Senate Bill 5 suggests that the Legislature intended to raise the liability caps on hospital authorities when it raised them on municipal-

ities. The purpose of Senate Bill 5 was to give municipalities greater certainty as to the extent of their liability. It did so by reclassifying many of a municipality's proprietary functions—for which it had unlimited liability—as governmental functions—for which its liability is limited by the Tort Claims Act. Tex.Civ.Prac. & Rem.Code § 101.0215. In exchange, the Legislature raised the limits of municipalities' liability. *Id.* § 101.023(c). As a result, municipalities enjoyed immunity for more of their functions even though their maximum liability exposure when immunity was waived increased. Unlike municipalities, hospital authorities have only governmental functions and thus have always been immune from liability for all their actions, except to the extent immunity is waived by the Tort Claims Act. *See Classen v. Irving Healthcare Sys.,* 898 S.W.2d 300 (Tex.1995); *Childs v. Greenville Hosp. Auth.,* 479 S.W.2d 399 (Tex.Civ.App.—Texarkana 1972, writ ref'd n.r.e.). Hospital authorities therefore could not benefit from a reclassification of proprietary functions as governmental. If Senate Bill 5 raised the limits on hospital authorities' liability, it did so without giving them the same benefit of broader immunity that it gave municipalities. It is unlikely that the Legislature would have done this without comment.

The court of appeals based its holding on the control a municipality has over a hospital authority it creates, and the dependency of the authority on the municipality: "A hospital authority is formed by the municipality, governed by directors appointed by that municipality, and subject to dissolution by the municipality. It has no ability to raise money through taxes." 904 S.W.2d at 841. Thus, the court concluded, a hospital authority "is an extension of the municipality and is not a 'unit of local government.'" *Id.* But the interrelationship between a municipality and a hospital authority does not lessen the fact that the two entities are separate. In the Local Government Code "municipality" means a city. Tex.Loc.Gov't Code § 1.005(3). In chapter 29 of the Government Code "'municipality' means an incorporated city, town, or village." Tex.Gov't Code § 29.001. We are not aware of an instance when "municipality" is used to describe a

governmental unit with a special, limited purpose, like a hospital authority. Three statutes list municipalities and hospital districts as separate governmental entities. Tex.Civ. Prac. & Rem.Code § 9.002(b); Tex.Health & Safety Code 61.002(7); Tex.Loc.Gov't Code § 271.021. Many other statutes list municipalities separately from authorities generally. *E.g.,* Tex.Gov't Code §§ 419.021(4), 431.035(b), 431.045(b), 431.056(a), 441.031(3), 441.151(8), 554.001(2), 609.001(6), 810.001(1), 2251.001(4), 2252.001(2), 2254.002(1); Tex. Health & Safety Code § 773.003(17); Tex. Lab.Code §§ 22.001(6), 92.002(5); Tex.Loc. Gov't Code § 201.003(7), 201.007, 271.003(4), 271.903, 391.002(1); Tex.Rev.Civ.Stat.Ann. art. 601i, § 1(5) (Vernon Supp.1996). So consistently do the statutes treat municipalities and authorities separately that it is most unlikely that the Legislature should have intended to treat them the same in one statute absent some clear indication to the contrary. No evidence of such intent can be found in Senate Bill 5.

Perhaps the most persuasive indication of legislative intent is found in section 262.035 of the Health and Safety Code. That statute, enacted in 1993 (Act of May 27, 1993, 73rd Leg., R.S., ch. 558, 1993 Tex.Gen.Laws 2068), "applies only to an authority created in a county with a population of at least 350,000 in which a hospital district is not located." Tex.Health & Safety Code § 262.035(a). (Seven counties—Bexar, Dallas, El Paso, Harris, Hidalgo, Tarrant, and Travis have more than 350,000 in population. Dallas Morning News, Texas Almanac 133–283 (1995). It appears that two of them, Hidalgo and Travis, presently do not have hospital districts.) The statute authorizes a municipality to lease a hospital and other facilities owned by the municipality to a hospital authority. In that event, the municipality has more control over the authority than it would have otherwise. For example, the municipality may retain the power to appoint all directors of the authority, notwithstanding the exceptions set out in section 262.012, and if the municipality retains this power, it may remove any member at any time for cause. *Id.* § 262.035(b)(1), (c). The authority must perform specified services on the municipali-

ty's behalf and cannot eliminate them without the municipality's approval. *Id.* § 262.035(b)(2), (4). The authority cannot contract for management of the hospital without the municipality's consent. And authority employees may participate in the municipality's employee benefit plans.

Nevertheless, section 262.035(d) expressly provides that for purposes of the Tort Claims Act "a municipal hospital authority subject to this section is a unit of local government and not a municipality". *Id.* § 262.035(d). It is implausible that the Legislature would treat the more independent hospital authorities as municipalities, but hospital authorities that are subject to greater control by municipalities as other units of local government. The result would be that hospital authorities least like municipally owned hospitals would still be subject to the liability caps for those hospitals, while hospital authorities most like municipally owned hospitals would not be. There is no indication in the statutes that the Legislature intended this result.

The Treviños argue that to treat a hospital authority as a unit of local government but a municipally owned hospital as a municipality, subjecting them to different liability caps under the Tort Claims Act, denies the Treviños equal rights in violation of Article I, Section 3 of the Texas Constitution. The Court rejected a similar argument in *Guillory v. Port of Houston Authority*, 845 S.W.2d 812, 815 (Tex.1993): "one governmental unit cannot be denied the immunity to which it would otherwise be entitled simply because the Legislature has waived immunity for another governmental unit. One may disagree with the choices made by the Legislature, but one can hardly deny its power to choose."

Nor will we infer from the Legislature's possession of discretion that it has acted arbitrarily or irrationally, especially when a logical explanation for its action is apparent. It is clear to us that the Legislature intended only municipalities—cities and towns—to be subject to higher liability limits under section 101.023(c) of the Tort Claims Act. Thus, we hold that hospital authorities continue to be units of local government within the meaning of section 101.023(b) of the Tort Claims Act.

ABBOTT, Justice, concurring.

I join Parts I, III, and IV of the Court's opinion. I also join Justice Hecht's concurring opinion holding that the Edinburg Hospital Authority is a unit of local government subject to the liability limits imposed by section 101.023(b) of the Texas Civil Practice and Remedies Code. I do not join Part II of the Court's opinion. Instead, for the reasons articulated in Part I of Justice Gonzalez's dissenting opinion in this case and in Justice Kilgarlin's dissent in *Witty v. American Gen. Capital Distribs., Inc.*, 727 S.W.2d 503, 506 (Tex.1987), I would be inclined to overrule *Witty* and allow recovery for the wrongful death of a fetus. However, the Treviños have not made any argument to this Court that *Witty* should be overruled. Accordingly, based on the arguments presented to us by the parties, I concur in the Court's judgment as to Part II.

GONZALEZ, Justice, dissenting.

I join in Parts I and IV of the Court's opinion. However, I do not join the remainder of the opinion for three reasons: First, it perpetuates the harsh, antiquated, "born alive" rule that allows recovery for the wrongful death of a child only if the child survives the womb. In my opinion, there should be no difference in tort law whether the child's death occurs just before or just after birth. I would correct the errors the Court made in construing the Wrongful Death Statute in *Witty v. American General Capital Distributors, Inc.*, 727 S.W.2d 503, 506 (Tex.1987), and its progeny and hold that Edinburg General owed a duty to the mother, the father, and the baby. Second, the Court perpetuates the fiction that a full-term, pre-birth baby is nothing more than a glob of tissue that is part of the mother's body and thus not worthy of legal protection. While I concur in the Court's judgment allowing Mrs. Treviño a cause of action for negligence, I disagree with the Court's reasoning. Furthermore, I would also allow Mr. Treviño to assert a cause of action for negligence to recover damages for the mental anguish he suffered as a result of his unborn baby's death, though not under a bystander theory. Third, for the reasons stated in Justice

Hecht's concurring opinion, 941 S.W.2d at 90, I would hold that Edinburg Hospital Authority is a unit of local government subject to the bodily injury liability limits imposed by section 101.023(b) of the Texas Civil Practices and Remedies Code.

## I.

The Court continues to perpetuate the flaw in this State's jurisprudence which holds that parents cannot recover for the wrongful death of their unborn child. *See Krishnan v. Sepulveda,* 916 S.W.2d 478, 479 (Tex.1995); *Pietila v. Crites,* 851 S.W.2d 185, 187 (Tex. 1993); *Blackman v. Langford,* 795 S.W.2d 742, 743 (Tex.1990); *Witty v. American Gen. Capital Distribs., Inc.,* 727 S.W.2d 503, 506 (Tex.1987); *Tarrant County Hosp. Dist. v. Lobdell,* 726 S.W.2d 23, 23 (Tex.1987). I wish we would not continue to follow this anachronistic rule of law and instead join the overwhelming majority of jurisdictions that recognize some form of action to recover damages for an unborn child's death.[1]

The Court considers what other states have done in this regard, and concludes that it is up to our Legislature to create a cause of action for the wrongful death of a fetus. 941 S.W.2d at 79 n. 1. I agree with that principle, but the Legislature has already done its job. It has enacted a Wrongful Death Statute that allows a cause of action for damages "arising from an injury that causes an individual's death." TEX.CIV.PRAC. & REM.CODE § 71.002(a). However, in *Witty,* we erred in our interpretation of the statute by ignoring precedent and abdicating our responsibility in a manner that perpetuates inequity. *See Witty,* 727 S.W.2d at 506–12 (Kilgarlin, J., dissenting). In *Witty,* we also ignored the maxim that "[t]his court should not be bound by the prior legislative inaction in an area like tort law which has traditionally been developed primarily through the judicial process." *Sanchez v. Schindler,* 651 S.W.2d 249, 252 (Tex.1983).

At common law, the rights of a human being existed despite its unborn status. As Sir William Blackstone stated:

> Life … begins in contemplation of law as soon as an infant is able to stir in the mother's womb. For if a woman is quick with child, and … if anyone beat her, whereby the child dieth in her body, and she is delivered of a dead child; this, though not murder, was by the [ancient] law homicide or manslaughter.... An infant … in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate made to it. It may

1. *See* TENN.CODE ANN. § 20–5–106 (1994); *Wade v. United States,* 745 F.Supp. 1573, 1579 (D.Haw. 1990); *Espadero v. Feld,* 649 F.Supp. 1480, 1484 (D.Colo.1986); *Simmons v. Howard Univ.,* 323 F.Supp. 529, 529 (D.D.C.1971); *Eich v. Town of Gulf Shores,* 293 Ala. 95, 300 So.2d 354, 358 (1974); *Summerfield v. Superior Court of Maricopa County,* 144 Ariz. 467, 698 P.2d 712, 724 (1985); *Hatala v. Markiewicz,* 26 Conn.Supp. 358, 224 A.2d 406, 407–08 (1966); *Worgan v. Greggo & Ferrara, Inc.,* 128 A.2d 557, 558 (Del.Super.Ct.1956); *Greater Southeast Community Hosp. v. Williams,* 482 A.2d 394, 397–98 (D.C.1984); *Volk v. Baldazo,* 103 Idaho 570, 651 P.2d 11, 15 (1982); *Seef v. Sutkus,* 145 Ill.2d 336, 164 Ill.Dec. 594, 583 N.E.2d 510, 511 (1991); *Britt v. Sears,* 150 Ind.App. 487, 277 N.E.2d 20, 26–27 (1971); *Dunn v. Rose Way, Inc.,* 333 N.W.2d 830, 833–34 (Iowa 1983); *Hale v. Manion,* 189 Kan. 143, 368 P.2d 1, 3 (1962); *Mitchell v. Couch,* 285 S.W.2d 901, 906 (Ky.1955); *Danos v. St. Pierre,* 402 So.2d 633, 639 (La.1981); *State ex rel. Odham v. Sherman,* 234 Md. 179, 198 A.2d 71, 73 (1964); *Mone v. Greyhound Lines, Inc.,* 368 Mass. 354, 331 N.E.2d 916, 920 (1975); *O'Neill v. Morse,* 385 Mich. 130, 188 N.W.2d 785, 786 (1971); *Verkennes v. Corniea,* 229 Minn. 365, 38 N.W.2d 838, 841 (1949); *Terrell v. Rankin,* 511 So.2d 126, 127 (Miss.1987); *Connor v. Monkem Co.,* 898 S.W.2d 89, 92 (Mo.1995); *Strzelczyk v. Jett,* 264 Mont. 153, 870 P.2d 730, 733 (1994); *White v. Yup,* 85 Nev. 527, 458 P.2d 617, 623–24 (1969); *Poliquin v. MacDonald,* 101 N.H. 104, 135 A.2d 249, 251 (1957); *Salazar v. St. Vincent Hosp.,* 95 N.M. 150, 619 P.2d 826, 830 (App.1980); *DiDonato v. Wortman,* 320 N.C. 423, 358 S.E.2d 489, 495 (1987); *Hopkins v. McBane,* 359 N.W.2d 862, 865 (N.D.1984); *Werling v. Sandy,* 17 Ohio St.3d 45, 476 N.E.2d 1053, 1056 (1985); *Evans v. Olson,* 550 P.2d 924, 927–28 (Okla.1976); *Libbee v. Permanente Clinic,* 268 Or. 258, 518 P.2d 636, 640 (1974); *Amadio v. Levin,* 509 Pa. 199, 501 A.2d 1085, 1089 (1985); *Presley v. Newport Hosp.,* 117 R.I. 177, 365 A.2d 748, 754 (1976); *Fowler v. Woodward,* 244 S.C. 608, 138 S.E.2d 42, 45 (1964); *Wiersma v. Maple Leaf Farms,* 543 N.W.2d 787, 792 (S.D.1996); *Vaillancourt v. Medical Ctr. Hosp.,* 139 Vt. 138, 425 A.2d 92, 95 (1980); *Moen v. Hanson,* 85 Wash.2d 597, 537 P.2d 266, 268 (1975); *Farley v. Sartin,* 195 W.Va. 671, 466 S.E.2d 522, 535 (1995); *Kwaterski v. State Farm Mut. Auto. Ins. Co.,* 34 Wis.2d 14, 148 N.W.2d 107, 112 (1967).

have a guardian assigned to it; and it is enabled to have an estate limited to [its] use, and to take afterwards by such limitation, as if it were then actually born.

1 WILLIAM BLACKSTONE, COMMENTARIES *125–26.

Our Legislature has restricted the rights of a pre-born baby to protection under our state's criminal law by specifically defining "individual" as "a human being who has been born and is alive." TEX.PENAL CODE § 1.07(26); *Collins v. State*, 890 S.W.2d 893, 897–98 (Tex.App.—El Paso 1994, no pet.). However, in a civil context, no such limitation exists with regard to the Wrongful Death Statute. Therefore, nothing precludes us from overruling *Witty* and its progeny to correct the errors our Court made in those cases. *See Boyles v. Kerr*, 855 S.W.2d 593, 595–96 (Tex.1993) (overruling *St. Elizabeth Hosp. v. Garrard*, 730 S.W.2d 649 (Tex.1987) due to its erroneous interpretation of an earlier case and because it was out of step with most American jurisdictions); *Moser v. U.S. Steel Corp.*, 676 S.W.2d 99, 101 (Tex. 1984) (overruling *Reed v. Wylie*, 597 S.W.2d 743 (Tex.1980) and *Acker v. Guinn*, 464 S.W.2d 348 (Tex.1971) due to the uncertainty in determining title to minerals that resulted from those cases); *Sanchez*, 651 S.W.2d at 251 n. 2 (overruling *J.A. Robinson Sons, Inc. v. Wigart*, 431 S.W.2d 327 (Tex.1968) and related cases).

## II.

Because of advances in medical technology, it is no longer debatable that life begins before birth. Legal scholars have recognized as much: "So far as duty is concerned, if existence at the time of the tortious act is necessary, medical authority has long recog-

nized that an unborn child is in existence from the moment of conception." KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 55, at 367 (5th ed. 1984). One can debate the meaning and purpose of life, and what life is worth protecting, but under contemporary scientific standards, it is beyond dispute that a fetus is a human being from the moment of conception.[2] It can be nothing else. *See* Klasing, *The Death of an Unborn Child: Jurisprudential Inconsistencies in Wrongful Death, Criminal Homicide, and Abortion Cases*, 22 PEPP.L.REV. 933, 974 (1995). By eight weeks, the baby has its own beating heart, internal organs, external features, and a unique genetic code. *See* REECE ET AL., MEDICINE OF THE FETUS AND MOTHER 43–44, 48, 53–54, 117 (1992); HARRISON ET AL., THE UNBORN PATIENT 43 (2d ed. 1990). Besides the heart, brain, internal organs, and limbs, which are clearly not part of the woman's body, there are other parts such as the umbilical cord that are uniquely part of the baby's body. CUNNINGHAM ET AL., WILLIAMS OBSTETRICS 137 (19th ed. 1993). Human embryos may be removed from the uterus and implanted in a surrogate mother who is then able to deliver a baby at full term. *See generally*, SCOTT ET AL., DANFORTH'S OBSTETRICS AND GYNECOLOGY 739–55 (7th ed. 1994). Thus, "it is absurd to extend the legal fiction ... that an unborn child is 'a part of the mother's bowels' until the fetus is viable." *Rambo v. Lawson*, 799 S.W.2d 62, 69 (Mo. 1990) (Holstein, J., dissenting). I therefore reject the nonsensical view that within the realm of Texas tort law a dead unborn child is worth nothing, but an injured child born alive may sue and recover damages. *See Witty*, 727 S.W.2d at 507 (Kilgarlin, J., dissenting). As the Louisiana Supreme Court wisely stated:

---

2. Excerpts from medical textbooks illustrate the present scientific view that a baby's life begins at the moment of conception:

Human development begins at conception or fertilization, the process during which a male gamete or sperm (spermatozoon) unites with a female gamete or oocyte (ovum) to form a single cell called a zygote (Gr. *zygótos,* yoked together). This highly specialized, totipotent cell marked the beginning of each of us as a unique individual.

MOORE & PERSAUD, THE DEVELOPING HUMAN 14 (5th ed. 1993).

In the first pairing, the spermatozoon has contributed its 23 chromosomes, and the oocyte has contributed its 23 chromosomes, thus reestablishing the necessary total of 46 chromosomes. The result is the conception of a unique individual, unlike any that has been born before and unlike any that will ever be born again.

KRIEGER, THE HUMAN REPRODUCTIVE SYSTEM 88 (1969).

The loss to the parents of a child who otherwise would have been born normally is substantially the same, whether the tortfeasor's fault causes the child to be born dead or to die shortly after being born alive, and a cause of action for the loss should be recognized in either event, at least in the absence of specific legislation expressing a contrary intent. Moreover, a decision not to recognize a cause of action when the child is born dead would benefit the tortfeasor who causes a more serious injury, since the tortfeasor would have to pay damages if his fault causes a child to be born disabled, but would not have to pay any damages if his fault causes prenatal death.

*Danos v. St. Pierre,* 402 So.2d 633, 638 (La. 1981) (on rehearing) (footnote omitted).

We should admit the error of our ways. "[A] judicious reconsideration of precedent cannot be as threatening to public faith in the judiciary as continued adherence to a rule unjustified in reason...." *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 405, 90 S.Ct. 1772, 1790, 26 L.Ed.2d 339 (1970). We should not let the mechanical application of stare decisis prevent us from overruling our earlier decisions such as *Witty* wherein we erroneously determined the meaning of a statute. *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 695, 98 S.Ct. 2018, 2038, 56 L.Ed.2d 611 (1978) (holding that municipalities are "persons" under 42 U.S.C. § 1983 and are subject to liability, overruling *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). We have even done so in this particular area of the law. In *Leal v. C.C. Pitts Sand & Gravel, Inc.,* 419 S.W.2d 820, 821 (Tex.1967), this Court held that parents of a viable infant born alive have a cause of action under the Wrongful Death Statute if the baby later dies from injuries inflicted while in utero. In the process, we overruled *Magnolia Coca Cola Bottling Co. v. Jordan,* 124 Tex. 347, 78 S.W.2d 944 (1935), citing one legal writer who remarked that "[s]eldom in the law has there been such an overwhelming trend in such a relatively short period of time as there has been in the trend towards allowing recovery for prenatal injuries to a viable infant." *Leal,* 419 S.W.2d at 822. In *Leal,* we recognized an "impressive contemporary trend," and should do so again now. *Id.* Thus, I would hold that Mr. and Mrs. Treviño can assert a cause of action to recover damages for the wrongful death of their unborn child without forcing plaintiffs and sympathetic courts to look for creative ways to get around this harsh law and the fictions our Court has created.

### III.

Additionally, while I agree with the Court that neither Mr. Treviño nor Mrs. Treviño can recover damages as a bystander, I do not believe that this conclusion should bar Mr. Treviño's recovery. In the absence of a wrongful death cause of action that would allow fathers and mothers to recover for the loss of their unborn children, I would hold that Mr. Treviño can recover under a negligence theory based on the duty owed to him as the father of the unborn baby.

When a pregnant woman establishes a doctor-patient relationship with a physician for the prenatal care and delivery of a baby, the doctor owes a duty of care to the mother and baby. *See Yandell v. Delgado,* 471 S.W.2d 569, 570 (Tex.1971) (creating a duty to not inflict injury upon an unborn baby). Therefore, in reality, the unborn child is the doctor and hospital's "second patient." *See* PRITCHARD ET AL., WILLIAMS OBSTETRICS xi (17th ed. 1985). However, in *Krishnan,* the Court concluded that because there is no doctor-patient relationship between an obstetrician and the father of an unborn child, no duty is owed to the father. *Krishnan,* 916 S.W.2d at 482. This conclusion is wrong and serves only to perpetuate the myth that a father does not suffer mental anguish because of the death of his unborn child, and it amounts to unlawful gender discrimination. *Id.* at 483 (Gonzalez, J., dissenting). I believe that the better view is to recognize a duty to the father.

As we stated in *Boyles v. Kerr,* 855 S.W.2d 593, 600 (Tex.1993), "certain relationships may give rise to a duty which, if breached, would support an emotional distress award." We then stated in *Krishnan* that "[t]he physician/patient relationship is one such relationship." *Krishnan,* 916 S.W.2d at 482.

Under *Yandell*, a fetus injured while in utero, regardless of viability at the time of injury, has a cause of action for personal injuries provided the child is born alive and survives. *Yandell*, 471 S.W.2d at 570. Therefore, an expansion of the physician's duty is only necessary with regard to the expectant father. Otherwise, fathers are the only individuals in the father-mother-unborn child relationship to whom physicians owe no duty, and thus they are left without a remedy despite their painful loss.

The father should, in this narrow context, be owed a duty because of the special relationship that arises when a physician is entrusted by both parents to bring their child into the world. Texas courts have recognized in contractually based situations that a special relationship may "arise[ ] from the element of trust necessary to accomplish the goals of the undertaking." *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983) (Spears, J., concurring). It is my view that such a relationship exists between a father of an unborn baby and his wife and baby's physician, and that the father should be able to recover mental anguish damages for his loss. *See Stuart v. Western Union Tel. Co.*, 66 Tex. 580, 585, 18 S.W. 351, 353 (1885) (holding that telegraph company's failure to deliver a death message gave rise to mental anguish damages for brother of the deceased); *Pat H. Foley & Co. v. Wyatt*, 442 S.W.2d 904, 907 (Tex.Civ.App.—Hous. [14th Dist.] 1969, writ ref'd n.r.e.) (allowing mother of deceased to recover mental anguish damages for funeral home's negligent handling of her son's corpse).

Other courts have recognized a cause of action by concluding that a father is a third-party beneficiary of the doctor-patient relationship. For example, California recognizes an extension of duty to a father as a third-party beneficiary of his wife's doctor-patient relationship. *Andalon v. Superior Court*, 162 Cal.App.3d 600, 208 Cal.Rptr. 899, 905 (1984). In *Andalon*, the court concluded that both parents were direct victims of the doctor's negligent prenatal care. *Id.* The court reasoned:

> [The father's] injury is not merely derivative of Mrs. Andalon's injury but flows from his role as a participant in the reproductive life of the marital couple and its lawful choices. The burdens of parental responsibility fall directly upon his shoulders. The tort duty arising from the contract, between defendant and Mrs. Andalon, runs to him, not merely because of the foreseeability of emotional harm to him, but because of the nexus between his significant interests and the 'end and aim' of the contractual relationship. He is manifestly a direct beneficiary of tort-duty imposed by virtue of the doctor-patient relationship.

*Id.* This reasoning has been echoed in Louisiana. *See, e.g., Skorlich v. East Jefferson Gen. Hosp.*, 478 So.2d 916, 918 (La.Ct.App. 1985). In *Skorlich*, a father sued his wife's doctor and the hospital for injuries his child received during the birth process. *Id.* at 916. The court concluded that the hospital and the doctor owed a duty of care to both the mother and the father. *Id.* at 918. The court reasoned:

> In essence, the object of the undertaking is for the physician to treat the pregnancy which was created by the joint efforts of the father and mother. Although the father does not carry the fetus within his own body, it is his seed which created the fetus and thus imposed on him the obligation to care, protect and raise the fetus to adulthood. For that reason, the duty of the physician not to negligently injure the child during the birth process is a duty owed to the father as well as the mother. There is no reasonable basis for distinguishing between the father and mother.

*Id.* I agree with the results reached by these courts and would hold that doctors and hospitals owe fathers the same duty they owe to mothers in the context of prenatal care and delivery based on the special relationship created when a physician is entrusted by parents to bring a baby into the world.[3]

---

3. Today the Court does not pass on the merits of a third-party beneficiary claim. Thus, this is an open question. 941 S.W.2d at 79. Perhaps there is hope that in the future the Court will allow fathers to assert such a cause of action to recover mental anguish damages.

The evolution of tort law has made the concept of legal duty a particularly ripe area for continued judicial consideration. Indeed, "[t]he entire history of the development of tort law shows a continuous tendency to recognize as worthy of legal protection interests which previously were not protected at all." RESTATEMENT (SECOND) OF TORTS § 1 cmt. e (1965). As Dean Prosser observed, "[c]hanging social conditions lead constantly to the recognition of new duties. No better general statement can be made, than that the courts will find a duty where, in general, reasonable men would recognize it and agree that it exists." PROSSER, HANDBOOK OF THE LAW OF TORTS § 53, at 327 (4th ed. 1971), *quoted in Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 310 (Tex.1983) (imposing a duty on employers to act with reasonable care when exercising control over servants); *see also Sanchez,* 651 S.W.2d at 252 (allowing parents who lose minor child to recover for loss of society and mental anguish in response to the needs of modern society); *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 514–15 (Tex.1978) (extending to tenants' guests a landlord's duty owed to tenants to maintain portions of leased premises). It is only reasonable to conclude now that a duty is owed to a father by his unborn baby's physician.

The recognition of such a duty is also justified under the balancing test this Court uses when deciding whether a duty exists. Under that test, the Court must balance the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990).

Mr. Treviño's injury was foreseeable to Edinburg General. In its Policy and Procedure Manual for Labor and Delivery, Edinburg General lists its Standards of Nursing Care. The first standard states: "Patients *and/or significant others* can expect nursing care to be provided within a safe environment by protection from untoward events (falls and other incidents, *errors in the administration of medications and treatments,* cross contamination, and patient abuse)"

(emphasis added). The fact that it set forth such standards shows that Edinburg General could foresee the risk that treatment errors posed not only for the patient, but also for the patient's "significant other."

I recognize that the social utility of Edinburg General's actions is great and that the magnitude and consequences of placing this burden on Edinburg General are significant. Nevertheless, these considerations are outweighed by the risk, likelihood, and foreseeability of the injuries involved. Thus, these factors weigh in favor of imposing a duty on Edinburg General. I would therefore hold that Edinburg General owed Mr. Treviño the same duty of care with respect to prenatal care and delivery that it owed his wife and baby, and I would allow him to assert a cause of action to recover damages for mental anguish. *See Boyles,* 855 S.W.2d at 598.

### IV.

This modification of the law is necessary to eliminate confusion and gamesmanship, to clarify those events that justify mental anguish damages and those that do not, and to promote intellectual honesty in our courts. Because of the Court's adherence to the view that there can be no recovery for the death of an unborn child, judges and lawyers are forced to craft rationales to maneuver around existing precedent. An example of this maneuvering is the decision in *Krishnan.* The Court concluded that Mrs. Sepulveda had pleaded physical injury to herself when in fact there was no mention of a physical injury to her in the pleadings. *Krishnan,* 916 S.W.2d at 489–90 (Gonzalez, J., dissenting). The reality is that in *Krishnan,* Mrs. Sepulveda's pleadings contained no more an allegation of physical injury than Mrs. Treviño's pleadings in this case. The Court read such an allegation into Mrs. Sepulveda's pleadings to allow her a chance to recover, and does the same in this case.

Mr. and Mrs. Treviño seek to be compensated for their emotional harm suffered as a result of the loss of the child they expected to have. As the Court notes, Mrs. Treviño (Mora)

sought to prove mental anguish damages in part by presenting evidence that she

had made preparations in expectation of the arrival of her baby: she had set aside a room in her home for the baby and purchased furniture for the room. She also testified that the loss of the fetus 'still hurts [her] like it was yesterday,' that she carries a clipping of the funeral service with her, and that her marriage deteriorated after the loss of the fetus. This evidence relates to the grief that Mora felt over the loss of the fetus as a separate individual and not as part of her own body. 941 S.W.2d at 79.

Mr. Treviño also suffered emotional harm. His mother testified that he took the death of the baby "very hard. He wouldn't eat. He would spend a lot of time crying like a baby.... He started drinking a lot and started having ... problems like drinking and like crying.... He was not the same person anymore." 904 S.W.2d at 839. Oscar Treviño suffered as a result of this ordeal. He testified that the pain and anger he felt that day have continued to the present. *Id.*

As is evident, the Treviños' claims are indistinguishable from the plaintiffs' claims in *Krishnan,* 916 S.W.2d at 479, *Pietila,* 851 S.W.2d at 187, *Blackman,* 795 S.W.2d at 743, *Witty,* 727 S.W.2d at 506, and *Tarrant County Hospital District,* 726 S.W.2d at 23, which we have held not to be actionable. The Court today reaffirms these cases but does so in doublespeak that is bound to confuse the bench, the bar and juries: While "Mora (Mrs. Treviño) has a negligence claim against the hospital for the personal injury she sustained in losing the fetus," 941 S.W.2d at 79, "[t]he hospital could not be held liable for a negligent injury to Mora's fetus." 941 S.W.2d at 79.

The result of our case law is so harsh and inequitable that once again, as in *Krishnan,* the Court finds a way to circumvent precedent to reach the desired result. The Court is allowing plaintiffs to do through the back door what they cannot do through the front door. With a wink and a nod, the Court today asks judges and juries to pretend that the emotional harm and loss to the mother are caused by two injuries, one which is actionable and the other not. I believe juries will now compensate both injuries within one calculation, unable to perform the mental gymnastics the Court asks of them.

In truth, there is only one injury, one "occurrence in question." It is unreasonable to expect the trier of fact to ascertain damages for mental anguish due to the mother's personal injury (from the loss of her baby), while at the same time not consider any anguish the baby's death itself might have caused. As I wrote in *Krishnan:*

> What will the jury charge for this kind of case read in the future? Since this Court leaves *Pietila, Blackman, Witty,* and *Tarrant County Hosp. Dist.* on the books, of necessity a trial court will have to instruct the jury not to award damages to the mother "by way of consolation for the death" of the unborn baby or for "any sorrow, anguish, or grief suffered as a result" of the baby's death. *See* TEX.PATTERN J. CHARGES § 81.04 (1982). This instruction was made obsolete in the context of parents' wrongful death actions for the death of a child following its birth, *see id.* cmt. (Supp.1984) (citing *Sanchez v. Schindler,* 651 S.W.2d 249 (Tex.1983)), but it must be resurrected again to respond to the Court's writing today. Moreover, in light of today's opinion holding that a mother is not entitled to recover damages for the loss of society, companionship, and affection due to the unborn child's death, 916 S.W.2d at 482, a careful trial judge may well add the following instruction:
>
> > Do not include any pecuniary loss resulting from the death of [the baby]. Do not consider the love, comfort, companionship, and society that [the mother] would have received from [the baby]. Disregard any mental anguish suffered by [the mother] in the past or which will be suffered in the future resulting from the death of [the baby].
>
> *See id.* § 83.03A (Supp.1984) (stating the elements of recovery that the surviving parents of a minor child are entitled to in a wrongful death action). Although this instruction will be generally troublesome, the mental anguish component will probably be the most problematic. This Court holds that the injury resulting in the death of an unborn child due to a physician's

negligent prenatal care is a personal injury to the mother. Presumably, therefore, a trial judge will ask the general question for personal injury damages recoverable for a physician's negligence. The definition of mental anguish will also appear in the charge. The definition could state:

> Mental anguish means an emotional pain, torment, and suffering experienced by [the mother] as a result of the occurrence in question.

Alternatively, it could state:

> Mental anguish is a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

*See Treviño v. Southwestern Bell Tel. Co.*, 582 S.W.2d 582, 584 (Tex.Civ.App.—Corpus Christi 1979, no writ). This Court today rules that the "loss of the fetus" is a recoverable injury to the mother, 916 S.W.2d at 482, but that the death of the baby itself is not. Therefore, a trial judge probably should also add an exclusionary instruction, to wit: "Do not include any amount for mental anguish not resulting from the injury to the mother, if any, that resulted from the occurrence in question." ... It will not be surprising if the forgoing [jury charge] profoundly confuses juries, attorneys, and trial and appellate courts. *Krishnan*, 916 S.W.2d at 488–89 (Gonzalez, J., dissenting).

The approach I propose today is necessary to correct two grave harms. First, *Krishnan* and this case cause confusion due to the Court's recognizing a cause of action that looks and feels like a claim for the wrongful death of an unborn baby, while simultaneously denying the existence of such a claim. Second, we must dispel the fiction that an unborn child is simply a mass of tissue or just another part of its mother's body somehow not worthy of legal protection. One would think that an enlightened Court would recognize that at some point along the continuum from conception to birth, the unborn baby is worthy of legal protection.[4] The medical evidence undermining the notion that emotional harm from the death of one's unborn baby is caused by two distinct injuries is too great to continue this legal fiction any longer. In developing tort law, this Court is empowered to decide that Texas has an important, if not compelling, interest in protecting the life of an unborn child throughout all stages of pregnancy. *See, e.g., Planned Parenthood v. Casey*, 505 U.S. 833, 869–76, 112 S.Ct. 2791, 2816–20, 120 L.Ed.2d 674 (1992); *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 519, 109 S.Ct. 3040, 3057, 106 L.Ed.2d 410 (1989); *Roe v. Wade*, 410 U.S. 113, 162–63, 93 S.Ct. 705, 731–32, 35 L.Ed.2d 147 (1973). This interest has both a logical and biological justification, *Roe*, 410 U.S. at 163, 93 S.Ct. at 731–32, and its importance is not diminished merely because it is enforced in an action for damages at common law rather than by other regulatory means. I would therefore concede our errors, overrule *Witty* and its progeny, and join the overwhelming and growing majority of jurisdictions which allow recovery for the death of an unborn child.

For the foregoing reasons, I would affirm in part and reverse in part the judgment of the court of appeals.

---

4. Indeed, the high courts of several states now allow wrongful death protection for nonviable fetuses. *See Farley v. Sartin*, 195 W.Va. 671, 466 S.E.2d 522, 533–34 (1995) (18–22 week old fetus); *Wiersma v. Maple Leaf Farms*, 543 N.W.2d 787, 791 (S.D.1996) (7½ week old fetus); *Connor v. Monkem Co.*, 898 S.W.2d 89, 92–93 (Mo.1995) (16 week old fetus).