Alice Foxworth LANGFORD and Mark Edward Langford, Sr., Individually, and as Parents of Their Deceased Child, Robert Benjamin Langford, Appellants,

v.

Terry Lee BLACKMAN, Julie Barnes Webb, and Claudia Webb Blackman, Appellees.

No. 09–89–059 CV.

Court of Appeals of Texas, Beaumont.

May 31, 1990.

Rehearing Denied June 21, 1990.

B.D. Griffin, Hopkins & Corley, Conroe, T. Gerald Treece, Houston, for appellants.

Ruben Hope, Jr., W. Scott Goleman, Ruben Hope & Associates, Conroe, for appellees.

OPINION

BROOKSHIRE, Justice.

Appeal from the granting of a summary judgment. The paramount question is: Does a cause of action, under Texas law, exist for the wrongful death (negligently inflicted) of a "viable" but not naturally born child, Robert B. Langford? Appellants take the position that Robert Langford was a "viable fetus". A basic stipulation is that one of the defendants below, Terry Lee Blackman, operated his motor vehicle negligently and thereby caused the child's death. The death resulted from an automobile accident in Montgomery County. The accident occurred on October 22, 1983. Alice Langford sustained personal injuries in the collision. The yet unborn but "viable" Robert Langford perished. It is clear that, under summary judgment practice and summary judgment evidence, the Langford baby, Robert, existed in the last stages of pregnancy. A motion for summary judgment was filed and granted in favor of the defendants.

Basically the district court held that no duty existed as to Robert, basing the decision on *Witty v. American General Capital Distributors, Inc.*, 727 S.W.2d 503 (Tex. 1987). Appellants vehemently argue that this case and cause of action sub judice is meaningfully and crucially different and distinguishable from *Witty, supra.* Appellants state that the issues in this appeal are of first impression. A major thrust of this

argument is that the child Robert was in the last month of gestation and that the Appellants have made a clear and undeniable showing, at least for summary judgment practice, of the "viability" of Robert. Appellants' position is that in *Witty, supra,* no attempt was made to demonstrate "viability". Appellants, here, place major reliance and confidence in certain affidavits proffered to demonstrate that baby Robert was in the last month of gestation and was fully viable. Indeed, the Appellants argue that the trial court erred in reading *Witty,* to the effect that *Witty* did include the concept of viability and having done so, the trial court erroneously granted the motion for summary judgment.

The Appellants argue that this Court should hold and pronounce that a "viable fetus" is an individual person within the meaning of the Texas Wrongful Death Act. Appellants maintain that the failure to recognize a "viable" fetus or baby as an individual person impermissibly violates the Fourteenth Amendment to the United States Constitution. Appellants maintain that Baby Langford was a "person". Hence, failing to hold that Baby Langford was a person would necessarily also run contrary to the equal protection guarantee in the Texas Constitution.

Appellants poignantly aver that the equal protection rights and guarantees of the parents themselves are vitiated in that if Baby Langford had lived outside the womb but for a minute or two the parents would be definitely entitled to recover for his wrongful death. However, since the "viable" child was killed and did not live for a minute or two after a live birth, the district court found a total lack of duty on the part of the defendants.

A balanced reading of *Witty, supra,* affirms, we think, that the viability question of an unborn child in the very last stages of gestation was not squarely discussed nor decided. Importantly, in *Witty,* the Supreme Court recognized that difficulties exist in reducing or attempting to codify statutorily, the refinements of the doctrines of tort law into statutory enactments. These statutory enactments frequently result in legislation which is either too narrow or underinclusive or overbroad. The statutory enactments are frequently couched in ambiguous terms which appellate courts must interpret. The Texas Wrongful Death Act is a remedial one; it must be given a reasonably liberal interpretation. *Texas Wrongful Death Act, TEX. CIV.PRAC. & REM.CODE ANN. sec. 71.-002 (Vernon 1986).*

Inter alia, the Court in *Witty* did not rule upon the question and importance of the gestational age of the viable fetus. Nor did the High Court rule upon the Texas constitutional rights or the United States constitutional rights of an unborn, viable human being in the third trimester of gestation. Nor were the rights of the natural parents addressed under these constitutional guarantees. Nor did the *Witty* opinion address the status of an unborn human being that was viable under the rulings of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, *reh. den'd,* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973).

In *Roe,* the United States Supreme Court in summarizing, held that for the stages subsequent to viability, a State of the Union in the promotion of its interest in the potentiality of human life may regulate and even proscribe abortion or abortion procedures except where the abortion is necessary (substantiated by cogent medical judgment) for the preservation of the life or health of the mother. Even before that, for that stage of gestation which is approximately the end of the first trimester, a State of the Union, in promoting its interest in the health of the mother, may, if it so legislates, regulate abortions and abortion procedures in ways that are reasonably related and relevant to maternal health. Under the summary judgment practice and proof Baby Langford was unquestionably viable.

Texas has, consistent with *Roe,* enacted TEX.REV.CIV.STAT.ANN. art. 4495b (Vernon Supp.1990), cited as the "Medical Practice Act". In section 4.011(a)(3) "viable" is defined as "the stage of fetal development when in the medical judgment of the attending physician based on the partic-

ular facts of the case, an unborn child possesses the capacity to live outside its mother's womb after its premature birth resulting from any cause." Section 4.011(b) provides with certain exceptions, that a person may not intentionally or knowingly perform an abortion on a woman who is pregnant with a viable, unborn child during the third trimester of the pregnancy. The exceptions are generally that the fetus is not a viable fetus and that the pregnancy is not in the third trimester; that the abortion is necessary to prevent the death or substantial risk of serious impairment to the health of the woman involved; or that the fetus has a severe and irreversible abnormality.

Correct and compelling summary judgment proof is present in an affidavit of William E. Crowder, Jr., M.D. *Dr. Crowder testified that the infant*, Robert, was estimated to be in the 37th week of gestation and that the infant's weight was about six pounds four ounces. This was determined by development of the breast tissue, the creases in the bottom of the feet, the creases in the scrotum, and certain fat deposits under the skin as well as general appearance.

The doctor, by affidavit, swore that the infant was capable of sustaining his own life outside the uterus and that he had personally delivered many infants of smaller size and of earlier gestational age who had, indeed, survived. It was his medical opinion based upon reasonable medical probability that the infant that he removed from the abdomen of Alice Foxworth Langford on October 22, 1983, died of total abruption, by which he meant a shearing off, of the placenta caused by a blunt trauma to the abdomen of the mother. Exhibit B attached to the affidavit of Dr. Crowder is a color photograph of Robert. The photograph depicts a fully developed and normal head with hair, eyebrows, a pug nose, well-developed cheeks and lips. The picture speaks volumes, making the doctor's affidavit more meaningful. Robert was dressed in a light blue day gown with a matching bonnet that framed his face. The parents' grief and anguish is just as great in this case, we feel sure, as if Robert had had a normal delivery and had lived for a brief period of time before expiring.

The doctor's affidavit also reflected that it was his opinion, based again on reasonable medical probability, that the birth of an infant makes no medical or scientific difference neurologically; nor does a birth increase or diminish the infant's ability to react to stimulus or to his surroundings. Thus, a fetus in the third trimester of a pregnancy and an infant of the same gestational age already born possess in equal measure the following traits: awareness, reaction to stimuli and surroundings, and neurological development.

Dr. Crowder's affidavit set forth that Alice Langford was brought to the emergency room via ambulance after an automobile accident. He was called to see her because she was pregnant and the emergency room staff was unable to detect a fetal heartbeat or heart tones. An ultrasound examination followed which revealed that the infant had no cardiac activity and a tentative diagnosis of fetal death was arrived at. Because of this patient's prior history of a caesarian section and her current condition which evidenced abdominal pain and a recent history of abdominal trauma, the doctor elected to do an emergency caesarian section. The abdomen was entered, the uterus was found ruptured in the upper section (the fundus) and the infant child was in the abdominal cavity. The uterus was repaired but with some difficulty. The patient also was noticed to have had a ruptured spleen which was removed by another surgeon.

A second doctor, Heinrich G. Schettler, M.D., P.A., gave an affidavit stating that he was a duly licensed physician to practice medicine in Texas, and that Alice Langford had been an established patient in his office since May 6, 1982. During an office visit on October 20, 1983, an ultrasound was performed on Alice that revealed a normal male fetus with good fetal motion and activity. No abnormalities were noted. This was her last recorded visit. The pregnancy had progressed normally. In his professional opinion based on reasonable medical probability on October 20, 1983, the fetus

was viable and would have survived outside the uterus.

■ Under this summary judgment record we conclude and hold that when a viable fetus or infant rather than a non-viable one is killed through negligence or negligent acts; then, both the parents as well as that viable fetus or child have suffered a tortious wrong. We hold that the failure to include viable, 37 weeks of gestational age Robert, though unborn, was error. Robert was a person within the meaning of the Texas Wrongful Death Act. We find reversible error. The Appellants should have been and must be afforded the right and opportunity to establish this viability and thus be enabled to pursue a recovery under the Texas Wrongful Death Act, TEX.CIV.PRAC. & REM.CODE ANN. sec. 71.002 (Vernon 1986), and also the Survival Act, TEX.CIV.PRAC. & REM.CODE ANN. sec. 71.021 (Vernon 1986). *Since there is summary judgment proof of the viability of the child in the 37th week of gestation, which child was capable of living outside the mother's body, we distinguish the appeal sub judice from Witty, supra, and sustain Appellant's point of error number one.*

■ Indeed, the Appellees refer to Robert as an "unborn child". Under this record, for summary judgment purposes Robert would have been a live, born normal child but for the defendants' wrong-doings which were proximate causes of the death of Robert. Robert was a person and an individual human being because, *inter alia*, he was uniquely in the 37th week of gestation and but for the automobile crash, Robert would have experienced a live birth and not unreasonably a normal life span. Robert was stillborn because of the collision. The negligence and proximate cause questions and issues in this case were not considered for purposes of the partial summary judgment. Robert was a person and an individual in every significant sense. He, however, did not attain a live, natural birth.

The Texas Constitution's Article I, section 13 providing for the open court provision has been violated and vitiated by the ruling below. Robert never had his day in court. We are unwilling to return to the medieval and brutal common law concept that it is more profitable for a wrong-doer to kill than to maim or injure. *Witty, supra,* did not decide the status of a 37 week gestation human being who was fully capable of a live birth and living outside of the mother.

A balanced summary of the summary judgment proof before us from Dr. W.E. Crowder and Dr. Heinrich G. Schettler demonstrates:

1. the uterus was ruptured in the upper section and the infant (note the medical doctor used the word infant) was in the abdominal cavity;

2. the infant weighed six pounds, four ounces, the uterus was repaired with some difficulty; and,

3. Mrs. Langford also suffered a ruptured spleen which was removed.

The curricula vitae of both physicians was very impressive and much too long to recite here.

The Supreme Court held in *Leal v. C.C. Pitts Sand and Gravel, Inc.,* 419 S.W.2d 820 (Tex.1967) *that a right of action exists under the Wrongful Death Act*—as well as a cause of action—where the injured party could have maintained an action for damages had death not ensued. Here, viable infant Robert would certainly have had a right of action and a cause of action had his death not been caused by the wrongful acts of Appellees. In *Leal,* the child lived only two days. The Supreme Court, in reality and in practicality, recognized and approved a right of action for prenatal injuries. Here we are asked to treat differently a viable, capable of living outside the mother's body, 37 week gestational age Robert, though yet unborn in the natural sense, from those litigants who have been born alive.

The trial court was conscientiously applying decisional precedent. Without any criticism whatsoever, we feel constrained to conclude that such interpretation and distinction as to Robert are not permissible and the same offends the Bill of Rights of the Texas Constitution, Article I, secs. 3

and 3a. Hence, illogically, inhumanely, and medievally, if the trauma, wrongful act, neglect, recklessness, and carelessness are so severe and so deadly and so unskillful as to kill the child, then there is no remedy or recovery—argued the Appellees. If, however, the trauma, wrongful act, neglect, carelessness, and unskillfulness are considerably less serious and result in the child's non-fatal injury, then a recovery may be allowed. This result, in Robert's case, is unacceptable under the contemporary, state-of-the-art of science and medicine; this concept being especially cogent and compelling when dealing with a human being *at or after nine months of gestation.*

To illustrate the anomaly and the fallacy in treating or classifying Robert merely as a dead fetus, the two following examples are proffered. Take the case of twin fetuses. Say there was a Robert and a Roberta. Both were injured in an automobile collision. Roberta survived and had a live birth and lived one day. Robert perished before a live birth. In Roberta's case, the Wrongful Death Act and the Survival Act would apply. There is no real, meaningful difference, in our view, between the situation of Robert and Roberta.

Next, take the case where an expectant mother, having carried her child to full term, was advised by her physician that a caesarian section was not only advisory but necessary. The caesarian section was scheduled for a Tuesday with the appropriate supporting medical staff, including an anesthesiologist. However, on Monday, about mid-afternoon, the anesthesiologist who had been scheduled for Tuesday morning was in a very serious car wreck himself and could not perform his medical duties. However, the main surgeon immediately arranged for another anesthesiologist to be available on Thursday morning. On the intervening Wednesday, the expectant mother was in a serious car wreck and although she could have and would have had a healthy, normal caesarian live birth with long life for her child, because of the wrong-doing, negligence, and recklessness of another motorist, her baby experienced a "fetal death". The fallacy (not to mention the harshness) of denying a full recovery to the expectant mother merely because her first anesthesiologist was unable to attend the caesarian section scheduled originally for Tuesday is obvious.

### Sanchez v. Schindler

In *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983), the Court clearly held the damages for the wrongful death of a child are not limited to pecuniary losses. Several cardinal quotations possessing paramountcy shed searching and piercing light on our present appeal:

> Sanchez argues the pecuniary loss rule is based on an antiquated concept of the child as an economic asset, and should be rejected. We agree. *It is time for this court to revise its interpretation of the Texas Wrongful Death statutes in light of present social realities and expand recovery beyond the antiquated and inequitable pecuniary loss rule.* If the rule is literally followed, the average child would have a negative worth.... *The real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship and society.* (Emphasis added.)

*Id.* at 251. "The real loss" is exactly what Mr. and Mrs. Langford experienced in this case. The Texas Supreme Court unequivocally held that a plaintiff may recover for the loss of companionship and the society as well as the loss of love, advice, and comfort of the child. The next cogent quote is:

> .... It is, therefore, logical for this court [Texas Supreme Court] to now act in response to the needs of a modern society, and abolish the antiquated rule in favor of recovery of loss of society and mental anguish.

> This court has always endeavored *to interpret the laws of Texas to avoid inequity. As a result, the court has abolished other antiquated doctrines....*

> The legislature has attempted to amend the Texas Wrongful Death Act to allow damages for loss of society and mental anguish; however, none of the

bills have passed. This court should not be bound by the prior legislative inaction in an area like tort law which has traditionally been developed primarily through the judicial process.... Inaction of the legislature cannot be interpreted as prohibiting judicial reappraisal of the judicially created pecuniary loss rule....

*This court has recognized previously that injuries to the familial relationship are significant injuries and are worthy of compensation....* We held that loss of affection, solace, comfort, companionship, society, assistance, and sexual relations were real, direct, and personal losses and said that these losses were not too intangible or conjectural to be measured in pecuniary terms. [Citing *Whittlesey v. Miller,* 572 S.W.2d 665 (Tex.1978) ] ...

*Id.* at 252.

The Supreme Court then concluded that "[t]here is no logical reason for treating an injury to the family relationship resulting from the wrongful death of a child more restrictively."

We do not attempt in any manner in this opinion to determine or pronounce when life begins. That question is not before us; we do not reach it. Nothing in this opinion is to be construed as being pro-abortion or anti-abortion, pro-choice or pro-life. None of these thorny issues are before us.

Our holding is that Robert Langford as a late-term, viable fetus, was a person or individual for the purposes of the Texas Wrongful Death Act and Survival Act.

The dissent places major confidence and reliance upon *Tarrant County Hospital District v. Lobdell,* 726 S.W.2d 23 (Tex. 1987). Interesting and noteworthy is that *Lobdell* was decided on *Witty.* Again, neither *Witty* nor *Lobdell* adjudicate a 37–week gestational age individual such as Robert. The medical doctors' unequivocal and meaningful affidavits with the appropriate and compelling exhibits distinguish this appeal. The summary judgment evidence and record on Robert is startlingly, dramatically, different and distinguishable from either *Witty* or *Lobdell.*

The dissenter emphasizes the dissent in *Witty.* In other words, the dissent here is based on a dissent—not on the Supreme Court's opinion in *Witty.* Interestingly enough, however, the dissenter in *Witty,* Justice Kilgarlin, indicates—indeed, more than indicates—that he would agree with the 9th Court's majority opinion in the instant case.

But let's again construe in a reasonable, practical way, TEX.CIV.PRAC. & REM. CODE ANN. sec. 71.002(b), which provides that a person is liable for damages arising from an injury that causes an individual's death if the injury is caused by the person, his agent's or servant's wrongful act, neglect, recklessness, unskillfulness or default. Under this record Robert was an individual.

There is nothing in 71.002 that requires a live, natural birth or a live, Caesarian section; the language of 71.002 is paramount. The language provides that an action for damages arises for an injury that causes an individual's death. In the state of this record there is no dispute about the fact that the negligence of the defendants caused the death of Robert, an individual. If there can arguably exist any doubt as to whether or not Robert was an individual, we need only to look at the picture in color of Robert. The Chinese sages were right, a picture is worth a thousand words. In Robert's situation a picture is clearly worth millions of words.

We have viewed the original color photograph of Robert, having requested the same to be sent to us from the court below. This color photograph is in the record. Initially a Xerox copy was attached to Dr. Crowder's affidavit; that Xerox copy was a dark void of Robert's face. It showed no features such as eyebrows, hair, nose, chin, cheeks, forehead. Our Clerk is ordered to send the original color photograph to the Supreme Court if a writ is granted.

We appreciate the difficulty, if not the impossibility, of accurately reproducing the color photograph of Robert for publication in this opinion; but suffice it to say, the majority of this Court did review Robert's

photo carefully and we would encourage the higher Court to do likewise, should such Court choose to review this case.

Having found error we reverse the judgment of the trial court and remand the cause for a full trial on the merits.

REVERSED AND REMANDED.

WALKER, Chief Justice, concurring.

I concur with Justice Brookshire's opinion with an "AMEN" and especially approve the last two paragraphs thereof.

I recognize that we are dealing with an absolute question of law matter and a photograph cannot and should not be probative to the answer. One might argue that to even consider the photograph begs sympathy. Sympathy has no part in my concurrence.

A jurist once proclaimed that he could not define pornography, but he recognized it when he saw it. I may not know how to perfectly define the word "person", but I sure can recognize one when I see one.

BURGESS, Justice, dissenting.

I respectfully dissent. I express no opinion on the substantive issues discussed by the majority, but base this dissent solely on the belief that our Supreme Court did include the concept of viability in *Witty v. American General Capital Distributors, Inc.*, 727 S.W.2d 503 (Tex.1987) and thus this court is bound by that decision. I point out that Justice Kilgarlin, in his dissent, expressly stated: "Note, and strongly note, that the *Leal* court 'reserved' the *very issue we have before us today*, death of a viable fetus before birth." *Id.* at 510–511. [emphasis mine] Justice Kilgarlin, in two other instances, speaks of viability: "the trend toward allowing recovery for prenatal injuries to a viable infant . . .", *Id.* at 511 and "Currently, thirty-five states and the District of Columbia allow wrongful death actions to be brought on behalf of stillborn, viable fetuses." *Id.* at 512.

To further support my belief that viability was within *Witty*, I look to the original case, *Witty v. American General Capital Distributors, Inc.*, 697 S.W.2d 636 (Tex.

App.—Houston [1st Dist.] 1985). In a concurring and dissenting opinion, Justice Dunn stated: "Baby Witty has, for the first time, presented us with the issue of a child having the ability to survive outside the womb, who was wrongfully injured, and who died of those injuries prior to birth." *Id.* at 643. Furthermore, Chief Justice Evans, on Motions for Rehearing, stated: "the majority does not consider the viability of the injured child to be an issue." *Id.* at 648.

The requirement of a live birth was clearly announced in *Yandell v. Delgado*, 471 S.W.2d 569 (Tex.1971) and the issue of viability was contained in *Witty*, however, the Supreme Court continued to follow the *Yandell* rule.

In *Tarrant County Hospital District v. Lobdell*, 726 S.W.2d 23 (Tex.1987), our highest court stated in no uncertain terms: "This cause raises the issue of whether a wrongful death action can be brought under the Texas Wrongful Death Act, [citation omitted] when a *viable fetus is negligently killed*". [emphasis mine] In a per curiam opinion, the court cited *Witty*, reversed the Fort Worth Court of Appeals and upheld the trial court's granting of a motion for summary judgment on the grounds the wrongful death statute did not allow such a cause of action. The Supreme Court had an additional opportunity to carve a viability exception to the *Yandell/Witty/Lobdell* rule in *Wheeler v. Yettie Kersting Memorial Hospital*, 761 S.W.2d 785 (Tex.App.—Houston [1st Dist.] 1988, writ denied), but declined.

Consequently, I believe *Witty* and *Lobdell* are dispositive and controlling, thus they require that we affirm the trial court. Since the majority does not, I respectfully dissent.