Cassandra Deanne SOSEBEE and Michael Wayne Sosebee, Individually and as Next Friends of Baby Sosebee, Deceased, Appellants,

v.

HILLCREST BAPTIST MEDICAL CENTER and Debra Hughes, Appellees.

No. 10–99–111–CV.

Court of Appeals of Texas, Waco.

Dec. 15, 1999.

Rehearing Overruled Jan. 26, 2000.

Mark S. Stewart, Mark S. Stewart & Associates, Fort Worth, for appellants.

Roy L. Barrett, Keith C. Cameron, Naman, Howell, Smith & Lee, P.C., Waco, for appellees.

Before: Chief Justice DAVIS, Justice VANCE and Justice GRAY.

## OPINION

DAVIS, Chief Justice.

Cassandra Deanne Sosebee and Michael Wayne Sosebee filed suit against Hillcrest Baptist Medical Center, Debra Hughes and three physicians for damages arising from alleged negligence in Cassan-

dra's treatment and in the treatment of the Sosebees' unborn son which allegedly resulted in the stillbirth of their son. The Sosebees non-suited the physicians and proceeded against only Hillcrest and Hughes, a Hillcrest nurse. Hillcrest and Hughes (collectively, "Appellees") filed a motion for summary judgment which asserts that the Sosebees have no basis for a recovery because their child was stillborn and because there is no evidence of any negligence on the part of Appellees in their treatment of Cassandra. The court granted Appellees' motion without specifying the basis for its ruling.

The Sosebees claim in five issues that the trial court: (1) erred in shortening the time for them to respond to Appellees' motion for summary judgment; (2) erred in failing to recognize that Cassandra has a valid cause of action for mental anguish damages arising from Appellees' alleged negligence; (3) erred by failing to recognize that the Sosebees can assert a wrongful death or survival action on behalf of their stillborn child; (4) violated the federal and state constitutions by failing to recognize wrongful death and survival claims brought on behalf of a stillborn child; and (5) erred by failing to recognize Michael's claim for mental anguish damages.

### BACKGROUND

Cassandra's amnion ruptured at the beginning of her thirtieth week of pregnancy, causing the discharge of amniotic fluid. She went to Hillcrest where she was admitted to the labor and delivery section of the hospital. An attending physician instructed Cassandra's nurses among other things to "apply EFM" (electronic fetal monitoring) at 9:00 on the morning of Cassandra's admission. Nurse Hughes came on duty that evening. At 11:00 that night, the physician instructed Hughes to take Cassandra's vital signs every four hours and her temperature every hour.

According to this physician, the protocol at Hillcrest called for labor and delivery nurses to record the fetal heart rate at least hourly as a part of the vital signs to be monitored. Tracey A. Kasnic, a nurse designated by the Sosebees as an expert, testified that the physician's instructions are confusing because she would construe the directive to "apply EFM" to require continuous monitoring as opposed to hourly monitoring. Kasnic conceded that she is not familiar with the Hillcrest protocol for hourly monitoring.

Pursuant to the physician's instructions, the nursing staff placed an electronic fetal monitor on Cassandra's abdomen. Hughes checked the fetal heart rate hourly and made a printout of the heart rate during the time periods she personally monitored it. The cumulative time Hughes personally monitored the fetal heart rate amounts to approximately fifteen minutes from 11:00 that night to 4:30 the next morning.

Hughes noted shortly after 4:00 that morning that the fetal heart rate had decelerated to a level of 55 beats per minute. She notified the physician of the low heart rate, and the physician decided to deliver the child by caesarian section. A neonatologist attended the delivery. The Sosebees' baby had no heart rate or respirations after delivery. The neonatologist declared him stillborn after attempting for fifteen minutes to resuscitate him.

The Sosebees filed suit two years later. Their petition alleges in pertinent part:

△ During the time period between admission and delivery, Mrs. Sosebee was inappropriately and inadequately monitored and/or treated;

△ Had Defendants properly monitored and cared for Mrs. Sosebee and Baby Sosebee, Baby Sosebee would still be alive today;

△ Defendants were guilty of various acts and omissions, each of which were negligent, and each of said acts and omissions of negligence, acting jointly or severally, being a proximate cause of the incident in question and the wrongful death of Plaintiffs' child, re-

spectively. Said acts and omissions of negligence include but are not limited to, the following:

- failure to properly read and/or interpret the test results to properly diagnose Mrs. Sosebee and/or Baby Sosebee's condition;
- failure to perform additional testing, observation and treatment;
- failure to obtain the consultation of a licensed medical doctor and/or specialist who could properly diagnose and care for Mrs. Sosebee and/or Baby Sosebee;
- failure to conduct medical exams and/or perform medical tests to determine the nature and extent of the health problems experienced by Mrs. Sosebee and/or Baby Sosebee; and
- failure to make every effort to protect and preserve the health, safety, and life of Mrs. Sosebee and Baby Sosebee;

△ Plaintiffs allege and show that the medical treatment and death of their infant son, Baby Sosebee, and damages sustained by Plaintiffs were proximately caused by the negligence of Defendants, and that such negligence was the proximate cause of the eventual death of Baby Sosebee and damages sustained by Plaintiffs. Defendants were responsible, in whole or in part, for the treatment and observation of Mrs. Sosebee and Baby Sosebee. As a result, Defendants have a duty to Plaintiffs to protect Mrs. Sosebee and Baby Sosebee from injuries and death and to properly test, diagnose, treat, and observe for further treatment. Plaintiffs allege that Defendants breached their duty to Mrs. Sosebee and Baby Sosebee and to Mr. Sosebee which proximately caused the wrongful death of Baby Sosebee and the damages suffered by Plaintiffs;

△ As a further result of the negligence of Defendants, Plaintiff Mr. Sosebee suffered the loss of income while he stayed at home to care for his wife and children;

△ As a direct and proximate result of the negligence of the Defendants as described above, Plaintiffs have suffered a serious loss of affection, solace, comfort, companionship, society, and assistance that they would have received from their son. Plaintiffs have also suffered severe physical and mental pain, suffering and anguish, and, in all probability will continue to suffer in this manner for the rest of their lives; and

△ The above and foregoing acts and/or omissions on the part of all Defendants amounted to a conscious indifference. This indifference facilitated the entire want or lack of care for Mrs. Sosebee and Baby Sosebee. Defendants' conduct was of the kind and character that constituted gross negligence.

During the prosecution of the suit, the parties deposed several physicians and nurses including those designated as experts. The court set the case for jury trial on February 8, 1999. Appellees deposed Nurse Kasnic on December 15, 1998. The Sosebees designated Dr. Jose L. Gonzalez as an expert on December 18. Appellees scheduled the deposition of the Sosebees' expert Dr. Harold J. Miller for December 18, but he asked them to reschedule it because of a conflict. Appellees deposed Dr. Gonzalez on January 9. Appellees deposed Dr. Miller on January 23.

Appellees filed their motion for summary judgment on January 26. They supported the motion with excerpts from the depositions of Dr. Gonzalez, Nurse Kasnic, and one of Cassandra's treating physicians. They simultaneously filed a motion asking the court to shorten the Sosebees' time to respond to the summary judgment motion.

The court heard Appellees' motion to shorten the Sosebees' response time on January 29. Appellees argued that they

could not reasonably have filed their summary judgment motion any sooner because of the deposition schedule. They informed the court of their belief that the summary judgment motion would resolve most, if not all, of the Sosebees' claims "and forego the need for trial." Accordingly, they asked the court to direct the Sosebees to file their response on February 3 or 4 and set the motion for hearing on the day after the Sosebees filed their response.

The Sosebees' counsel responded that he had several depositions and a mediation scheduled that week and it would be difficult to respond by the time requested. Counsel noted that he had not yet received a transcription of Dr. Miller's deposition. Counsel objected that shortening the time for his response would be "unfair ." He offered to respond by February 8 but insisted that an earlier response would be "simply unfeasible." The court noted counsel's concerns but directed counsel to file the response by February 4. The court set the summary judgment motion for hearing on the afternoon of February 5.

Appellees filed a verified copy of Dr. Miller's deposition transcript on January 29. They filed a motion asking the court to consider this additional evidence on February 1. Three days later, they filed a supplemental motion asking the court to consider not only Dr. Miller's deposition testimony but also the affidavit of the neonatologist who attended the Sosebee child's delivery. On February 5, Appellees filed a supplemental motion for summary judgment referring to the evidence from these two additional witnesses and reasserting the grounds raised in the original motion.

The Sosebees filed their response to the summary judgment motion on the morning of February 4. They attached only a brief excerpt from Dr. Miller's deposition testimony to support their response. They did not file an affidavit explaining any need for further discovery or a motion for continuance. The court granted Appellees' motion to present additional summary judgment evidence. After hearing, the court granted the motion for summary judgment and rendered judgment that the Sosebees take nothing by their lawsuit.

## SHORTENED RESPONSE TIME

■ The Sosebees argue in their first issue that the court erred by shortening their time to respond to Appellees' motion for summary judgment. They assert that if given more time they could have produced additional evidence in response to the motion. However, when a party contends that it does not have adequate time to respond to a summary judgment motion, "it must file either an affidavit explaining the need for further discovery or a verified motion for continuance." *Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 647 (Tex.1996). The Sosebees did neither. Thus, they have not preserved this issue for our review. *See* TEX. R.APP.P. 33.1(a)(1). Accordingly, we overrule their first issue.

## WRONGFUL DEATH AND SURVIVAL CLAIMS

The Sosebees' third issue contends that the court erred in failing to recognize a wrongful death or survival claim on behalf of their stillborn son. Their fourth issue alleges that the court's failure to recognize these claims violates their child's federal and state constitutional rights. The fourth issue similarly asserts that the court's decision violates the Sosebees' own federal and state constitutional rights. The fourth issue also challenges the Texas wrongful death and survival statutes as unconstitutionally vague and ambiguous because their present interpretation by Texas courts violates the aforementioned state and federal constitutional rights.

### WRONGFUL DEATH AND SURVIVAL CLAIMS CONCERNING A CHILD NOT BORN ALIVE

■ The Supreme Court of Texas has uniformly held for almost thirty years that

an unborn child has no cause of action for prenatal injuries unless the child is born alive. *Witty v. American Gen. Capital Distribs., Inc.*, 727 S.W.2d 503, 504 (Tex. 1987); *Yandell v. Delgado*, 471 S.W.2d 569, 570 (Tex.1971) (*per curiam*); accord *Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 78 (Tex.1997); *Krishnan v. Sepulveda*, 916 S.W.2d 478, 479 (Tex.1995); *Pietila v. Crites*, 851 S.W.2d 185, 187 (Tex.1993) (*per curiam*). An unborn child is not a "person" or "individual" for purposes of the wrongful death statute.[1] *Witty*, 727 S.W.2d at 504. Thus, the parents of a child whose death is caused by prenatal injury may not bring a wrongful death or survival action on behalf of their child unless the child is born alive. *Edinburg Hosp. Auth.*, 941 S.W.2d at 78; *Krishnan*, 916 S.W.2d at 479; *Pietila*, 851 S.W.2d at 187; *Blackman v. Langford*, 795 S.W.2d 742, 743 (Tex.1990) (*per curiam*); *Witty*, 727 S.W.2d at 504–06. Accordingly, we overrule the Sosebees' third issue.

### THE CONSTITUTIONAL RIGHTS OF AN UNBORN CHILD

In *Langford v. Blackman*, the Beaumont Court of Appeals engaged in an exhaustive examination of the above precedents and concluded that the Supreme Court had not squarely addressed "the constitutional rights of an unborn, viable

human being in the third trimester of gestation." 790 S.W.2d 127, 128 (Tex.App.— Beaumont 1990). The court held that the unborn child in that case "was a person and an individual in every significant sense" who "never had his day in court."[2] *Id.* at 130. The court concluded that the Supreme Court's interpretation of the wrongful death and survival statutes requiring a live birth as a condition precedent to suit violates the equal rights, equal protection, and open courts provisions of the Texas Constitution. *Id.* at 130–31; TEX. CONST. art. I, §§ 3, 3a, 13.

The Supreme Court reversed in a *per curiam* opinion without mentioning the constitutional issues addressed by the lower court. *Blackman*, 795 S.W.2d at 743. We surmise from this summary reversal that the Supreme Court of Texas has determined that an unborn child is not a person entitled to the protections of the Texas Constitution.

Concerning the federal constitution, the United States Supreme Court made its position on this issue clear in the landmark case of *Roe v. Wade*. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Roe*, the Court held, "[T]he word 'person,' as used in the Fourteenth Amendment, does not include the unborn." *Id.* at 158, 93 S.Ct. at 729.[3]

---

1. The Court concluded that the legislature must amend the wrongful death statute to change this result. *Witty v. American Gen. Capital Distribs., Inc.*, 727 S.W.2d 503, 506 (Tex.1987). Thus far, the legislature has declined to do so.

2. The Langfords presented compelling summary judgment evidence that their son Robert was a viable, unborn child in the 37th week of gestation who would have been born alive but for the negligence of Blackman, whose vehicle collided with theirs. *Langford v. Blackman*, 790 S.W.2d 127, 129–30 (Tex.App.— Beaumont), *rev'd*, 795 S.W.2d 742 (Tex.1990) (*per curiam*). The record in the Sosebees' case contains limited evidence of viability: gestational age and the fetal heart rate detected prior to surgery. In the summary judgment context however, we must indulge every reasonable inference arising from the evidence in favor of the nonmovants and resolve

any doubts in their favor. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997).

3. The United States Supreme Court did recognize, however, that the states each have an "important and legitimate interest in potential life" which becomes "compelling" once the unborn child develops to the point of "viability." *Roe v. Wade*, 410 U.S. 113, 163, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973). Thus, the states may regulate a mother's right to abort her viable, unborn child even to the point of proscribing abortion, "except when it is necessary to preserve the life or health of the mother." *Id.* at 163–64, 93 S.Ct. at 732. Texas has exercised its interest in this regard by prohibiting third-trimester abortions except in limited situations and by requiring a physician to give 48 hours' notice to the parent or guardian of a pregnant minor before

Following *Roe* and *Blackman,* we conclude that the protections of the federal and state constitutions do not extend to an unborn child.

## THE CONSTITUTIONAL RIGHTS OF PARENTS OF A STILLBORN CHILD

■ The Fort Worth Court of Appeals has recently determined that the above-cited interpretation of the wrongful death and survival statutes denies constitutionally-mandated equal protection to the parents of a viable, unborn child who is subsequently stillborn. *Parvin v. Dean,* 7 S.W.3d 264, 276 (Tex.App.—Fort Worth 1999, no pet. h.).[4]

■ However, the Sosebees' statutory right to maintain a wrongful death or survival action on behalf of their unborn son "is entirely derivative of [their son's] right to have sued for his own injuries immediately prior to his death, and is subject to the same defenses to which [their son's] action would have been subject." *Diaz v. Westphal,* 941 S.W.2d 96, 98 (Tex.1997); *Russell v. Ingersoll–Rand Co.,* 841 S.W.2d 343, 347 (Tex.1992). Plaintiffs in such cases "stand in the legal shoes of the decedent." *Russell,* 841 S.W.2d at 347; *CBI NA–CON, Inc. v. UOP, Inc.,* 961 S.W.2d 336, 341 (Tex.App.—Houston [1st Dist.] 1997, pet. denied).

The United States Supreme Court and the Supreme Court of Texas have determined that the protections of the state and federal constitutions do not extend to the unborn. *Roe,* 410 U.S. at 158, 93 S.Ct. at 729. *Blackman,* 795 S.W.2d at 743. Because the Sosebees' unborn son had no constitutional rights and because their wrongful death and survival claims are "entirely derivative" of any claim their unborn son could have pursued, we conclude

that the Sosebees' constitutional claims must fail.

Accordingly, we overrule the Sosebees' fourth issue.

## CASSANDRA'S MENTAL ANGUISH CLAIM

■ The Sosebees claim in their second issue that the court erred by failing to recognize that Cassandra has a valid cause of action for mental anguish damages arising from Appellees' alleged negligence. Appellees respond that they established as a matter of law that they were not negligent in their treatment of Cassandra.

The Sosebees' petition alleges that Appellees were negligent in their treatment of Cassandra and of their son. The summary judgment evidence conflicts on the question of whether Appellees were negligent in their treatment of Cassandra. The Sosebees apparently did not question any of the experts in the depositions. Rather, they reserved their questioning for trial. Thus, the depositions of the Sosebees' experts are limited to cross-examination by Appellees.

Each expert stated that their primary criticism of the treatment provided in this case is that the fetal heart rate was not appropriately monitored. Dr. Gonzalez agreed that he has "no criticisms of the care of the mother." Dr. Miller provided inconsistent testimony about the care provided:

Q: Do you have any criticisms of the care provided to the mother?

A: Since the mother and baby is a single unit while she is in labor and delivery, and since labor and delivery essentially is an intensive care

---

performing an abortion on the minor. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 170.001–170.002 (Vernon Supp.2000); TEX.FAM.CODE ANN. §§ 33.001–33.011 (Vernon Supp.2000). However, the legislature has declined thus far to identify even a viable, unborn child as an "individual" entitled to the protections of the wrongful death statute. *See* note 1, *supra.*

4. The Beaumont Court discussed the constitutional rights of such parents in *Langford* but did not hold that the parents' constitutional rights were violated by the wrongful death and survival statutes as interpreted by Texas courts. *See Langford,* 790 S.W.2d at 128–31.

Q: unit for obstetrical patients, then I feel like that they somewhat come together. But specifically did the nurses do anything that they—did they not do anything they should have as far as the mother is concerned, if the answer to that question is they didn't monitor her well as it directly affects the baby, then I would say both are involved.

Q: And I understand that's a complex question and I certainly understand your answer. But what I'm just trying to do by virtue of elimination is, as far as the care of the mother herself and her own well-being as an individual, you are not critical of either the physicians, based on your brief review, or the nursing staff's care of the mother?

A: Right.

Q: What you are critical of is the nursing staff's monitoring of the fetus, including—or really primarily the fetal heart tones?

A: That is correct.

Q: For example, there was no medication given the mother that was contraindicated and there was not other treatment rendered to the mother, things done to the mother herself, that you find below the standard of care in the treatment of her?

A: Correct.

Q: And there was nothing that the nurses failed to do with regard to treatment of the mother that you find below the standard of care?

A: Outside monitoring the mother and the baby that she is carrying.

Q: Well, I understand that you believe there was a failure to adequately monitor the fetus's heart tones.

A: Yes.

Q: And of course the fetus is in the mother. So you put the monitoring device on the mother in order to monitor the fetal heart tones, right?

A: Correct.

Q: So you're saying you have to actually put something on the mom to monitor fetal heart tones, so that involves mom. Is that what you're saying?

A: Yes.

Q: But what you're saying was the deviation from the standard of care was in the care of the fetus.

A: Yes.

Q: And the result that you're saying possibly occurred is injury to the fetus?

A: Yes.

Q: There was no failure to meet the standard of care in caring for the mother herself?

A: Yes, that's correct.

Q: And there was no injury to the mother herself as far as personal injury to her?

A: I don't recall any.

Q: And your sole criticism of the nursing staff and sole area in which you believe the nursing staff fell below the standard of care was in monitoring the fetus's heart tones?

A: Yes.

Later, Dr. Miller testified further about his criticisms of the monitoring:

Q: What you're critical of is the—what you believe to be inadequate monitoring earlier and the failure to know whether or not the heart tones had been down lower at some earlier period of time?

A: Yeah. I'm critical of the monitoring, probably from the onset of her admission throughout her period of time.

and

Q: And so if there were two different nurses monitoring during that period of time you would say both of them were not adequately monitored?

A: Whoever was monitoring that patient at the time—whoever was involved with it I feel like that the monitoring was inadequate.

Concerning the Sosebees' allegations of gross negligence, Dr. Miller testified:

Q: Do you see any evidence of gross negligence in this case?

A: I see the evidence of negligence by not properly monitoring this mother. I think the definition as far as gross negligence is concerned really relates to what the nurses were taught. If they were trained to monitor 29-weekers with placement of that strip on that baby to get a clean record, then I think it borders on or goes into gross negligence. But I think it probably goes back to what the protocol of the hospital is.

In February 1995, the Texarkana Court of Appeals determined that, if the mother of a stillborn child alleges that she herself received negligent prenatal care and shows that this negligent care caused "physical injury and mental anguish independent of the stillbirth," then she may recover her damages. *Booth v. Cathey,* 893 S.W.2d 715, 718–19 (Tex.App.—Texarkana), *rev'd on other grounds,* 900 S.W.2d 339 (Tex. 1995). On June 15, the Supreme Court issued its decision in *Krishnan,* holding:

We see no rational basis for excluding recovery of mental anguish damages in personal injury actions which have as one element the loss of a fetus. Consequently, we hold that [the mother] may recover mental anguish damages suffered as a result of her injury which was proximately caused by [the doctor's] allegedly negligent diagnosis, prenatal supervision and treatment of the mother and which includes the loss of her fetus.

*Krishnan,* 916 S.W.2d at 482; *accord Edinburg Hosp. Auth.,* 941 S.W.2d at 79 (mother of stillborn child may recover for "a personal injury including the loss of her fetus resulting from a breach of a legal duty owed to [the mother]").

One week after issuing *Krishnan,* the Supreme Court reversed the Texarkana

Court's decision in *Booth* on a notice issue but expressly affirmed the lower court's holding that the mother had stated a valid cause of action for her physical and mental injuries proximately caused by the defendants' negligence in treating her, which injuries included the loss of her unborn child. *Cathey v. Booth,* 900 S.W.2d 339, 342 (Tex.1995) (citing *Krishnan,* 916 S.W.2d at 482).

In the summary judgment context, the movant must demonstrate that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997). We disregard all conflicts in the evidence and accept the evidence favoring the nonmovant as true. *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.,* 391 S.W.2d 41, 47 (Tex.1965); *Kehler v. Eudaly,* 933 S.W.2d 321, 324 (Tex.App.—Fort Worth 1996, writ denied). We indulge every reasonable inference from the evidence in favor of the nonmovant and resolve any doubts in its favor. *American Tobacco,* 951 S.W.2d at 425.

■ We apply these same principles to the summary judgment evidence of a single witness which contains conflicts or inconsistencies, some of which favor the movant and some the nonmovant. *See Randall v. Dallas Power & Light Co.,* 752 S.W.2d 4, 5 (Tex.1988) (per curiam); *Knetsch v. Gaitonde,* 898 S.W.2d 386, 388–89 (Tex.App.—San Antonio 1995, no writ); *Cortez v. Fuselier,* 876 S.W.2d 519, 521–22 (Tex.App.—Texarkana 1994, writ denied). Inconsistencies create a fact issue to be resolved by a jury. *Id.*

Dr. Miller testified in several instances that the nursing staff at Hillcrest failed to properly monitor Cassandra. We must disregard the portions of his testimony which tend to contradict these statements. *See Great Am. Reserve Ins.,* 391 S.W.2d at 47; *Kehler,* 933 S.W.2d at 324. Accordingly, indulging every reasonable inference from the evidence in favor of the Sosebees and resolving all doubts in their favor, we conclude that material fact issues exist on

the question of whether Appellees were negligent in their treatment and care of Cassandra. *See American Tobacco,* 951 S.W.2d at 425.

The Sosebees allege in their petition that Appellees were negligent in their treatment of Cassandra. Dr. Miller's testimony raises material fact issues concerning whether Appellees were negligent as alleged. Accordingly, the court erred in granting a summary judgment in favor of Appellees on Cassandra's claim for mental anguish damages proximately caused by Appellees' alleged negligence. Therefore, we sustain the Sosebees' second issue.

## MICHAEL'S MENTAL ANGUISH CLAIM

■ The Sosebees aver in their fifth issue that the court erred by failing to recognize that Michael has a valid claim for mental anguish damages. They expressly acknowledge that the Supreme Court held in *Krishnan* that a father cannot recover mental anguish damages in this type of case, even though the mother can.[5] *See Krishnan,* 916 S.W.2d at 482.

The Sosebees rely on the dissenting opinion of Justice Gonzalez in which he took the *Krishnan* majority to task for creating what he perceives to be "a new rule that unconstitutionally discriminates between the sexes as to who can recover mental anguish damages for the child's death without a compelling state interest to justify the distinction." *Id.* at 483 (Gonzalez, J., dissenting); *see also Parvin,* at 279. However, the majority rejected Justice Gonzalez's position.[6] Accordingly, we overrule the Sosebees' fifth issu

## CONCLUSION

We have determined that the trial court erred in rendering a summary judgment

on Cassandra's claim for mental anguish damages because material fact issues remain on the question of whether Appellees were negligent in treating her. However, we have found no error with respect to the remainder of the issues presented by the Sosebees. Accordingly, we will affirm the judgment in part and reverse and remand the judgment in part.

We affirm the portion of the summary judgment granted on the Sosebees' wrongful death and survival claims and on Michael's claim for mental anguish damages. We reverse the portion of the summary judgment granted on Cassandra's claim for mental anguish damages proximately caused by Appellees' alleged negligence, sever, and remand that portion of this cause to the trial court for further proceedings consistent with this opinion. *See Aero Energy, Inc. v. Circle C Drilling Co.,* 699 S.W.2d 821, 823 (Tex.1985); *Blankenship v. Brazos Higher Educ. Auth., Inc.,* 975 S.W.2d 353, 364 (Tex.App.—Waco 1998, pet. denied).

---

**5.** The Court did recognize, however, that a father "has a separate and independent cause of action for loss of consortium as a result of an injury to [his wife]." *Krishnan v. Sepulveda,* 916 S.W.2d 478, 482 n. 5 (Tex.1995).

**6.** The Fort Worth Court followed Justice Gonzalez's dissent in *Parvin* and concluded that denying a father's claim for mental anguish

damages in this type of case constitutes gender discrimination and violates the equal rights guarantee of the Texas Constitution. *Parvin v. Dean,* 7 S.W.3d 264, 279 (Tex.App.—Fort Worth 1999, no pet. h.). In view of the Supreme Court's majority opinion in *Krishnan* however, we must disagree.