**Opinion issued December 22, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00399-CV

————————————

## CHRISTUS HEALTH GULF COAST D/B/A CHRISTUS ST. JOHN HOSPITAL, Appellant

## V.

## JAY HOUSTON, Appellee

On Appeal from the 55th District Court
Harris County, Texas
Trial Court Case No. 2011-01306

## MEMORANDUM OPINION

This is a medical-malpractice case. Christus Health Gulf Coast contends that the trial court improperly excluded expert testimony, miscalculated damages, and failed to order periodic payments. We modify and affirm.

## Background

Following surgery on his shoulder, plaintiff-appellee Jay Houston sued defendant Dr. Marston Holt (the orthopedic surgeon who performed the surgery) and defendant-appellant Christus Health Gulf Coast (the hospital where the surgery was performed). During the surgery, Houston's axiliary artery was cut, and Houston lost about 1,500–2,000 cubic centimeters of blood. Dr. Holt applied pressure until the bleeding stopped. Because the bleeding stopped, he did not call in a vascular surgeon.

Sometime after the surgery, the axillary artery occluded resulting in an ischemia—i.e., blood stopped circulating to Houston's arm and hand. In his petition, Houston alleged that Dr. Holt and the hospital nurses "failed to detect and correct the occluded artery and failed to properly monitor and manage Mr. Houston's post-operative course, resulting in the injury going undetected until permanent damage was done to the nerves and muscles of the Plaintiff's left arm."

Houston settled with Holt and proceeded to trial on his claim against Christus for its nurses' alleged post-surgery negligence.

### A.    Dr. Gomez

Christus designated Dr. Miguel Gomez, a cardiovascular and thoracic surgeon, as a trial expert. According to Christus, Dr. Gomez planned testify that (1) Dr. Holt breached the standard of care by not immediately calling in a vascular

2

surgeon during the surgery, and (2) Houston almost certainly suffered nerve damage during the original shoulder surgery—before the ischemia—and that this caused some or all of the harm to Houston. Houston filed a pre-trial motion to exclude Gomez's testimony, which the trial court denied.

During trial, Houston renewed his objection to Gomez's testimony, and a lengthily hearing was held outside the presence of the jury. Specifically, Houston argued that Gomez was not qualified to testify that the harm to Houston occurred during the original surgery and not the after-care and, alternatively, that there was no foundation for that opinion. Throughout that hearing, the trial court expressed concern about allowing Gomez to testify as to whether Houston's injury was caused during the original surgery, as opposed to during the care following the surgery:

> Q. Part of your testimony in this case is that this nerve injury to Mr. Houston happened at the time of the original laceration of the artery by Dr. Holt, correct?
>
> A. Yes.
>
> Q. Explain to Court what the basis of that opinion is. How do you believe that on why -- what is your foundation?
>
> . . . .
>
> A. . . . .[B]ecause of where the injury occurred and the artery. Like I stated earlier, there's is multiple nerves, and it's almost virtually impossible to injure an artery without – with a significant injury that the patient had without also involving the nerves in that area. And the patient since the moment of the operation had no function in that extremity, it's reasonable to ascertain that he had nerve injury since the time of his first surgery.

3

Q. Dr. Martin this morning said that the base -- the reason that he knew that it wasn't a nerve injury was because after he restored the vascular artery to his arm, that it immediately pinked up and he was able to move his fingers. Why is that not a reasonable explanation?

A. Because -- just 'cause a hand returned blood flow and you can see that it went from dusty to pink, that's not an assessment of the nerve function of that extremity. And from the injuries that he's had from the initial operation, he never had complete regain – he did not retain all of his nerve function from the initial surgery. *And so there almost impossible to determine what part was due to the injury during the first surgery and what was due to ischemia. It's – it's impossible to know.*

Q. How would it ever be possible to know – *I mean, would it ever be possible?*

A. *No.*

Q. *So part of your opinion is there is no way to separate out whether the nerve injury was completely done at the time of the first surgery due to a nerve injury or was a combination of a nerve injury of the first surgery and ischemia caused by the thrombosis?*

A. *Right.*

. . . .

* * *

Q. Just that how much – you tell him. I can't.

A. *The radial nerve injury is was what occurred at the time of the operation. And the other -- the median never, the ulnar nerve, it's difficult to tell whether that occurred at the time of the surgery or that occurred from the ischemia. Nobody can know that, but the radial never, I think, without a doubt, it's out from the site of the injury all of the way down the arm.*

THE COURT: What damage does relate? What damages that result in?

. . . .

A. *Well, that's difficult to ascertain. I mean, how much of it-- he would have recovered if – the injuries were so large by the time they operated on him on Monday that the -- vascular surgeon decided*

4

*not to address the injury and just to bypass it. So he never looked at the spot where he was injured because it was so big he didn't think he could handle it. If he would have called the vascular surgeon at the time of surgery, it would have been much less. So -- and the vascular surgeon might have decided to approach where the artery was injured and fix the artery right there at that time.*

*But, I mean, it's hard to tell. I mean, it's hard to know.*

Ultimately, the trial court ruled that Dr. Gomez could testify that Holt breached the standard of care by not immediately calling in a vascular surgeon during the surgery, but the court excluded his testimony about the second topic, i.e., the opinion that nerve damage during the original shoulder surgery—before the ischemia—is what caused some or all of all of the actual long-term injury to Houston. The court explained, "What weighed on me is it was outside of his expertise. And, second, is that he couldn't directly link it to a damage, because he kept saying, well, I'm not sure if that's what caused it, maybe partial. I don't know if it was. So I strike it."

Christus did not end up calling Gomez live because of scheduling issues. Portions of Gomez's deposition testimony, however, were then played for the jury, during which he testified that he was board certified in general, cardiovascular and thoracic surgery, and that about 30% of his practice is dedicated to vascular surgery. He opined that Holt deviated from the standard of care during the surgery:

Q. Are you going to offer any opinions regarding the orthopedic care of Dr. Holt in this case?

A. In how he handled the vascular injury, I would say yes.

Q. Well, have you formulated any opinions that anyone in this case deviated from the standard of care?

A. I think Dr. Holt did.

Q. In what way?

A. I think a surgeon that experiences a major bleed of greater than two liters on a patient during an operation that usually does not cause much bleeding, and that patient requires blood transfusions, and that patient at the time of his discharge is not having a functioning extremity and is still discharged home and the surgeon doesn't have any suspicions or curiosity to investigate further where all that bleeding came from, I don't think that's the standard of care. I think most doctors would investigate that further.

Q. If Dr. Holt investigated further or immediately obtained a vascular surgeon and repaired the axillary artery during the operation, do you have an opinion as to what the change or what the cause, the casual effect would have been on Mr. Houston?

A. It's difficult to say.

Q. So you don't have an opinion within a reasonable degree of medical probability?

A. It's difficult to say how -- I mean...

Q. Let me ask it this way.

A. I mean, it's -- how much of his nonfunctioning of his arm is nerve versus muscle and skin, I am not an expert to testify to. So if the artery was repaired immediately, he might have not had as much muscle and skin damage to his extremity. How much nerve damage would have been saved, it's hard to tell.

Q. Let's break it down. You've testified that discharging Mr. Houston by Dr. Holt with a nonfunctioning left extremity was a deviation of the standard of care?

A. Yes.

Q. Okay. If he didn't discharge and complied with the standard of care, would there be -- do you have an opinion within a reasonable degree of medical probability whether or into that would have caused any difference in the outcome of this case?

6

A. It's possible.

Q. So you're a vascular – you're a cardiothoracic surgeon, a vascular surgeon, correct?

A. Correct.

Q. Vascular integrity is your expertise, correct?

A. Correct.

Q. Okay. Are you going to offer the opinion that Dr. Holt deviated from the standard of care for not seeing Mr. Houston in the PACU?

A. I would say yes. I would say most surgeons, if they have an extraordinary amount of bleeding during the case, that they usually would go check on that patient in the PACU and make sure that there is not more bleeding going on, there is not a major injury that needed to be addressed that they missed in the OR.

Q. No, no. Let me rephrase the question. The question is: If Dr. Holt was in surgery the entire time that doctor -- or that Mr. Houston was in the PACU –

A. Uh-huh.

Q. -- and didn't have an opportunity to leave the operating room to see Mr. Houston prior to him being discharged to the floor, would you still fault Dr. Holt for not seeing Mr. Houston in the PACU?

A. If you have a patient that you're concerned about because there has been a major bleed during the operation and they're in the PACU after your operation, I -- most doctors, if they can't come to the bedside at least to look at the patient, would at least call back there to see how their patient is doing and talk to the nurse, "Is everything okay?"

Q. You say most doctors would have seen a patient such as Mr. Houston in the PACU?

A. If they can, yes.

7

**B.     The Jury's Verdict and the Trial Court's Judgment**

The jury found that the negligence of both Dr. Holt and Christus's nurses proximately caused Houston's injuries. It assigned 40% responsibility to Holt and 60% of the responsibility to Christus. The jury also found that Houston's injury was not the result of gross negligence. It awarded a total of $1,610,000.00 in damages, as follows:

| | | |
|---|---|---|
| a. | Past pain and mental anguish | $130,000.00 |
| b. | Future pain and mental anguish | $225,000.00 |
| c. | Future loss of earning capacity | $450,000.00 |
| d. | Past disfigurement | $25,000.00 |
| e. | Future disfigurement | $150,000.00 |
| f. | Past physical impairment | $50,000.00 |
| g. | Future physical impairment | $100,000.00 |
| h. | Past household services | $0.00 |
| i. | Future household services | $175,000.00 |
| j. | Future medical care | $305,000.00 |

Following extensive briefing by the parties on the topics of settlement credits, interest, costs, and Christus's request that a portion of the judgment be made periodically in the future, the trial court signed its first final judgment, "after applying settlement credits and statutory limitations on noneconomic damages,"

8

awarding a total of $1,427,826.76, plus prejudgment interest, post-judgment interests, and costs, against Christus as follows:

| | | |
|---|---|---|
| 1. | Noneconomic damages | $497,826.76 |
| 2. | Earning capacity in the future | $450,000.00 |
| 3. | Household services in the future | $175,000.00 |
| 4. | Medical care in the future | $305,000.00 |

Following a round of post-judgment briefing, the trial court signed an amended final judgment reducing the award of damages to a total of $1,180,000.00 plus prejudgment interest, post-judgment interests, and costs, against Chrisus as follows:

| | | |
|---|---|---|
| 1. | Noneconomic damages | $250,000.00 |
| 2. | Earning capacity in the future | $450,000.00 |
| 3. | Household services in the future | $175,000.00 |
| 4. | Medical care in the future | $305,000.00 |

Christus timely appealed.

## ISSUES ON APPEAL

Christus raises the following issues:

1. It was reversible error to exclude Dr. Gomez, defendant's vascular surgery expert, because it deprived defendant of a fair trial and caused the rendition of an improper judgment.

**2.** The amended final judgment is defective because it contains errors of law.

# EXCLUSION OF EXPERT TESTIMONY

In its first issue, Christus contends that the trial court erred by excluding portions of Dr. Gomez's expert testimony.

## A. Standards for admissibility of expert testimony

The standards for admissibility of expert testimony arise from Rule 702 of the Texas Rules of Evidence. *See* TEX. R. EVID. 702. "Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be 'scientific . . . knowledge'; and (3) the testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

Whether an expert is qualified is, under Rule 104(a), a preliminary question to be decided by the trial court. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex. 1998). The party offering the expert's testimony has the burden of showing that the witness is qualified under Rule 702. *Id*. "The offering party must demonstrate that the witness possess[es] special knowledge as to the very matter on which he proposes to give an opinion." *Id*.

"In order to constitute scientific knowledge which will assist the trier of fact, the proposed testimony must be relevant and reliable." *Id.* at 720. The relevance requirement is met if the expert testimony is "sufficiently tied to the facts of the

case that it will aid the jury in resolving a factual dispute." *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Evidence that has no relationship to any issue in the case does not satisfy rule 702 and is thus inadmissible under rule 702. *Id.*

When the reliability of an expert's testimony is challenged, the trial court must "gauge" the expert's reliability by ensuring "that the opinion comports with applicable professional standards outside the courtroom." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). If expert testimony is not reliable, it is not evidence. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 721–29 (Tex. 1997).

**B.     Standard of review**

We review a trial court's ruling on the admissibility of expert testimony under Rule 702 for abuse of discretion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 578 (Tex. 2006). "We will uphold a trial court's evidentiary ruling excluding expert testimony if a legitimate basis for the ruling exists. We reverse only if the trial court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles." *Wilson v. Shanti*, 333 S.W.3d 909, 912 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). "Thus, a trial court enjoys wide latitude in determining whether expert testimony is admissible." *Harris Cty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 157 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

11

## C.      The excluded testimony

Here, the trial court excluded the portion of Gomez's expert opinion that the injury to the nerves surrounding the axillary artery that Holt invariably caused during the shoulder surgery was responsible for at least a portion of Houston's disability. The trial court excluded this testimony based on Gomez's hearing testimony that he really could not say how much, if any, of the disability was caused by the surgery:

> Q:      So part of your opinion is there is no way to separate out whether the nerve injury was completely done at the time of the first surgery due to a nerve injury or was a combination of a nerve injury of the first surgery and ischemia caused by the thrombosis?
>
> A:      Right.

The trial court explained that he was bothered by the equivocation of the testimony, and that it was not based on reasonable medical certainty:

> [H]e couldn't directly link it to a damage, because he kept saying, well, I'm not sure if that's what caused it, maybe partial. I don't know if it was. So I strike it.

In other words, the trial court concluded that Gomez's testimony that Houston's injuries were caused by the initial surgery as opposed to after-care would not assist the trier of fact because Dr. Gomez himself admitted that, while he was certain that some nerve injury was caused during the surgery, it was

12

impossible to differentiate the effects of the surgical nerve injury from the effects of the post-surgical ischemia in causing Houston's disability.

Christus argues that the "weakness of facts in support of an expert's opinion generally goes to the weight of the testimony rather than the admissibility." (citing *LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 478 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)). It contends that, rather than excluding testimony, '[r]igorous cross-examination is a tried and true method to discredit hired guns disguised as experts."

While it is true that [t]he trial court's gatekeeping function under Rule 702 does not replace cross-examination as the traditional and appropriate means of attacking shaky but admissible evidence, . . . neither does the availability of cross-examination relieve the trial court of its threshold responsibility under Rule 702 of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Gammill*, 972 S.W.2d at 728.

In contending the trial court abused its discretion, Christus asserts that "Dr. Gomez used both the relevant facts of the case and his personal medical experience in order to formulate an informed conclusion as to the timing of [Houston]'s injuries." In its reply brief, it also argues that it "is well settled that a defendant may introduce evidence—typically an expert opinion—regarding another 'plausible cause' of the plaintiff's injury and the plaintiff must then exclude that

cause with reasonable certainty" because "[p]roximate cause . . . is the Plaintiff's burden and Defendant is not encumbered to prove it." Thus, Christus argues, Gomez was "not required to quantify the degree of causation or assign a percentage of causation as Plaintiff asserts."

Christus arguments are premised on its assertion that "Dr. Gomez was prepared to testify that in his expert opinion at the time that Mr. Houson's axillary artery was injured, multiple nerves were also injured, causing or contributing to Mr. Houston's permanent nerve damage." This assertion is, however, contrary to Gomez's *actual* testimony during the hearing that it was in fact "impossible to know" whether Houston's *disability*—the ultimate injury complained of—was caused by nerve injury during the surgery or by negligent follow-up care. In light of this testimony at the hearing, and given the trial court's gatekeeping role and broad discretion in evidentiary matters (as well as the fact that the jury ultimately found Holt 40% responsible for Houston's injuries), we cannot conclude that the trial court abused its discretion in ruling that Gomez could not offer testimony to the jury that Houston's disability flowed from Dr. Holt's actions in the initial surgery and not from the care of Chrisus's nurses post-surgery. Contrary to Christus's argument, the trial court did not exclude a portion of Gomez's testimony because he could not assign a specific percentage causation to Houston's disability; rather, the court excluded the portion of Gomez's testimony that Gomez himself

14

stated he did not have an opinion, i.e., not whether nerve injury was caused during the surgery, but whether that nerve injury or post-injury care caused Houston's disability. It was not an abuse of the trial court's discretion to exclude a portion of expert testimony for which the expert himself acknowledges he does not have any basis to opine.

We overrule Christus's first issue.

## CALCULATION AND PAYMENT OF DAMAGES

In its second issue, Christus argues that the amended final judgment is defective in several respects.

### A. Settlement Credit

We next consider whether a settlement must be offset before or after applying the damages cap on non-economic damages. TEX CIV. PRAC & REM. CODE ANN. § 33.012(b) provides: "If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements."[1] Before the trial of this case, Houston settled with Dr. Holt for

---

[1] Although no election is contained in the record, section 33.012 of the Texas Civil Practice and Remedies Code provides that, in a case involving a health care liability claim, damages should be reduced by the amount of all settlements or by the percentage of each settling party's responsibility as determined by the trier of fact. If no election is made before the case is submitted to the jury, any remaining defendant is deemed to have elected to have the claimant's recovery reduced by settlement credits rather than the percentage of responsibility of the settling party. TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(d).

$99,000.00. The trial court's amended final judgment calculated damages as follows:

| Damages | Verdict | Settlement credit | Christus | §74.301 cap applied to non-economic damages |
|---|---|---|---|---|
| Economic | $ 930,000.00 | | $930,000.00 | $930,000.00 |
| Non-economic | $ 680,000.00 | <99,000.00> | $581,000.00 | $250,000.00 |
| TOTAL | $1,610,000.00 | | $1,511,000.00 | $1,180,000.00 |

Christus argues that, by the trial court's applying Holt's settlement credit before applying the $250,000.00 cap on non-economic damages, it was deprived of any benefit from Holt's settlement. Christus argues that the trial court instead should have added together the economic damages and the cap on the non-economic damages ($930,000.00 + $250,000.00 = $1,180,000.00), and *then* applied the settlement credit ($1,180,000.00 - $99,000.00) to reach a total award of $1,081,000.00. (citing TEX CIV. PRAC. & REM. CODE ANN. § 33.013 (b) ("each liable defendant is. . . jointly and severally liable for *the damages recoverable by the claimant* under Section 33.012 with respect to a cause of action" (emphasis added)); *id.* § 74.301(b) ("In an action on a health care liability claim where final judgment is rendered against a single health care institution, the limit of civil liability for noneconomic damages inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant."); *id.* § 33.012(c) ("if the claimant in a health care

liability claim filed under Chapter 74 has settled with one or more persons, the court shall *further* reduce the amount of damages to be recovered by the claimant with respect to a cause of action by an amount equal to one of the following, as elected by the defendant: (1) the sum of the dollar amounts of all settlements . . . ." (emphasis added)).

Finally, Christus also complains that "applying the credit before reducing the non-economic damages by the statutory cap has the effect of only applying the credit to non-economic damages, which was not set out in the settlement agreement between Plaintiff and Dr. Holt."

In response, Houston cites the supreme court's decision in *Edinburgh Hospital Authority v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997). That case involved application of the Tort Claims Act's damages cap, which limits recoverable damages against a governmental unit to a total of $250,000.00. *Id*. at 81 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.023's waiver of governmental immunity up to a limit of $250,000 in damages for certain types of injuries). The plaintiff in that case settled with a responsible doctor for $44,000 pre-trial, and the jury awarded $750,000 against the remaining municipal hospital defendant. *Id*. The trial court applied the settlement credit first, and then reduced the total award to the $250,000 cap. *Id*. The supreme court held this was correct, reasoning that "[w]hen a plaintiff suffers an injury that falls within the Tort Claims Act, the

17

Legislature has agreed to hold the government liable up to a specified dollar amount" but that "a plaintiff may have settled with some defendants does not affect the degree of waiver of sovereign immunity that the Legislature has prescribed." *Id*. at *81–82.

> A settlement with one tortfeasor should thus be offset *before* the verdict against the governmental unit is reduced to the statutory maximum. A contrary rule, taken to its logical end, would completely bar recovery against a tortfeasing municipal hospital authority when a plaintiff settles with another defendant for more than the hospital authority's damages cap. Such a result cannot be the intent of the Legislature.

*Id*. at 82.

Christus argues that *Edinburgh* is distinguishable in that it involved a $250,000 on total damages rather than a $250,000 cap on only non-economic damages, as this case does. *Compare* TEX. CIV. PRAC. & REM. CODE § 101.023 (limiting damages against governmental entity to $250,000), with *id*. § 74.301(b) (limiting non-economic damages against heath care institution to $250,000).

Because the settlement amount was not limited to payment for non-economic damages, the trial court had no basis for applying the $99,000.00 settlement credit *only* to the non-economic damages awarded against Christus before applying the $250,000 cap on non-economic damages. We do not agree, however, that the non-economic cap applies, as Christus insists, before application

18

of the settlement credit offsets.  We instead apply *Edinburgh* to hold that settlement credits should be applied first.  *Edinburgh*, 941 S.W.2d at 81.

Because the settlement credit should not have been restricted to only non-economic damages, we reform the trial court's damages calculation to reduce each category of damages proportionally as follows:

***Trial Court's Calculation Applying Settlement Credit to Non-economic Damages Only***

| Damages | Verdict | Settlement credit | Christus | §74.301 cap applied |
|---|---|---|---|---|
| Economic | $ 930,000.00 | | $930,000.00 | $930,000.00 |
| Non-economic | $ 680,000.00 | <99,000.00> | $581,000.00 | $250,000.00 |
| TOTAL | $1,610,000.00 | | $1,511,000.00 | $1,180,000.00 |

***Proportionate Settlement Credit Allocation***

| Damages | Verdict | Settlement credit allocation | | Settlement credit applied |
|---|---|---|---|---|
| Economic | $ 930,000 | (930,000/1,610,000) x $99,0000 = | $57,186.34 | 930,000.00 -57,186.34 **$872,813.66** |
| Non-economic | $ 680,000 | (680,000/1,610,000) x $99,0000 = | $41,813.66 | 680,000.00 -41,813.66 $638,186.34 > $250,000.00 **$250,000.00** cap applies |
| TOTAL | $1,610,000 | less | $99,000.00 | **$1,122,813.66** |

Because the judgment on the jury's verdict should have been $1,122,813.66 rather than $1,180,000.00, we sustain the portion of appellant's second issue

19

complaining that it was error to apply the entire settlement credit to non-economic damages. We overrule the portion of appellant's second issue contending that the settlement credit should be applied after the non-economic damages cap is applied.

## B. Prejudgment Interest

Christus next contends that the trial court erred in its calculation of prejudgment interest. It argues that, "[o]ver objection, the Court simply accepted Plaintiff's calculation of prejudgment interest in the amount of $31,789.04." Because prejudgment interest cannot be awarded on future damages, TEX. FIN. CODE ANN. § 304.1045 (West 2006), Christus notes that "the calculation must be based on the jury's award of past damages for pain and suffering, disfigurement, and loss of household services, which totaled $205,000.00," and it begins accruing "the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." *Id*. § 304.104.

Christus contends that the prejudgment interest began accruing on January 7, 2011 (the date Houston filed suit[2]) and that it ran through February 12, 2014. Houston does not dispute in his brief that this is the relevant time period for calculation of pre-judgment interest, or that it is computed at 5% as simple, non-compounding interest.

---

[2] This is earlier than 180 days after Houston's December 21, 2010 written notice to Christus.

20

Christus's argument is two-fold. First, it takes issue with the trial court's calculation, noting that applying the principal*rate*time=interest formula—i.e., $205,000 * 5% * 3.09 years = $31,672.50—(rather than the $31,789.04 awarded by the court). But accepting that dates that Christus does not quibble with (that the beginning and ending dates for accruing prejudgment interest of January 7, 2011 through February 12, 2014), equates 3.101369 years, rather than 3.09 years as used by Christus's formula. Applying Christus's formula to the correct time period demonstrates no error in the trial court's prejudgment interest calculation of $31,789.04.

Next, Christus argues that the "proper and more fair calculation of pre-judgment interest should begin with an evaluation of how much of the capped non-economic damages are past damages and thus subject to prejudgment interest." According to Christus, because $205,000 (total amount of awarded past damages) constitutes 30% of the <u>total</u> non-economic damages awarded by the jury, $680,000, prejudgment interest should be applied to the same percentage of the capped damages." Accordingly, it argues, "it is only appropriate that pre-judgment interest be assessed on 30% of the total capped past-non-economic damages, which would be on $75,000, and not the total amount of past damages of $205,000."

Christus cites no authority for its argument, and we have located no authority in support. "Prejudgment interest is pecuniary in nature, because it does

not fall within the definition of noneconomic damages provided by the legislature in chapter 74, and because section 74.301's plain language limits only civil liability for noneconomic damages, . . . prejudgment interest is not included in section 74.301's limit on civil liability for noneconomic damages." *Chesser v. LifeCare Mgmt. Servs.*, L.L.C., 356 S.W.3d 613, 641 (Tex. App.—Fort Worth 2011, pet. denied).[3] Christus has not demonstrated that the trial court erred in its prejudgment interest calculation. We overrule that portion of appellant's second issue complaining that it was error for the trial court to award pre-judgment interest on the entire $205,000 past damages awarded.

## C. Periodic Payments

Finally, Christus argues that the trial court abused its discretion in denying its request to make periodic payment of future damages. Specifically, Christus filed a motion requesting that all awarded future medical expenses, $305,000.00, be made in periodic future payments. In contrast, Houston requested that only $50,000.00 of the future medical be reserved for future payments. The trial court granted Christus's request in part, ordering Christus to make a present payment of $200,000.00 with the remaining $105,000.00 to be made in periodic payments over the next ten years.

---

[3]    In contrast, prejudgment interest is "subject to the overall damage limit imposed by § 74.303." *THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 589 (Tex. App.—Amarillo 2010, pet. denied) (citing *Columbia Hosp. Corp. v. Moore*, 92 S.W.3d 470, 475 (Tex. 2002) (interpreting subchapter K of former article 4590i)).

22

This decision was within the trial court's discretion. Section 74.503(a) of the Texas Civil Practice and Remedies Code makes it mandatory, at the request of a heath care provider, to order *some or all* of future medical expenses be made in periodic payments. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.503(a) ("At the request of a defendant physician or health care provider or claimant, the court *shall* order that medical, health care, or custodial services awarded in a health care liability claim be paid *in whole or in part* in periodic payments rather than by a lump-sum payment." (emphasis added)); *Lee v. U.S.*, 765 F.3d 521, 529 (5th Cir. 2014) ("[T]he court does not have discretion as to whether it must order periodic payments for *at least a portion* of the damages for medical care." TEX. CIV. PRAC. & REM. CODE § 74.503.). There was evidence of at least $142,000 in medical expenses that Houston will incur in less than six years. Christus has not demonstrated an abuse of discretion in the trial court's ordering an immediate payment of $200,000.00 for future medical expenses.

Christus also requested that other future damages—including pain and suffering, disfigurement, physical impairment, household services, and lost wages—be made through future periodic payments. The trial court denied this request. Unlike future medical expenses, a trial court's decision whether to make these other types of payments to compensate for future damages periodic rather than lump-sum is completely discretionary. TEX. CIV. PRAC. & REM. CODE §

23

74.503(b) ("At the request of a defendant physician or health care provider or claimant, the court *may* order that future damages other than medical, health care, or custodial services awarded in a health care liability claim be paid in whole or in part in periodic payments rather than by a lump sum payment." (emphasis added)). There was evidence that Houston's current pain and impairment was affecting his ability to continue his employment and, and testimony that he and his ex-wife had to hire help to perform household tasks because of Houston's limitations. Given this evidence, Christus's argument that Houston's damages were anticipated to occur far off in the future does not establish an abuse of discretion. We accordingly overrule Christus's arguments that the trial court erred in refusing to order certain future payments.

## CONCLUSION

We modify the trial court's amended final judgment by reallocating, proportionately, the credit for Houston's settlement with Holt to reflect an award of $ 872,813.66 in economic damages and $250,000.00 in non-economic damages, for a total damages award of $1,122,813.66. We affirm the trial court's judgment as herein modified.

24

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.